# **Exhibits**

1. <u>Description:</u> Post-surgery Patient Education Sheet to Martha Rivera

   <u>Date(s):</u> September 6, 2017

   <u>Nature and Content:</u> This is the original letter filled out by Saint Vincent Hospital medical staff after surgery with Dr. Kim counseling me on post-surgery care on the day of my surgery, as is noted on the top right of the document. It advises limited activity until cleared by the doctor in a follow-up appointment. I gave my employer a copy

2. <u>Description:</u> Post-operative appointment made for the September 11, 2017

   <u>Date(s):</u> September 11, 2017

   <u>Nature and Content:</u> This is the appointment verification scheduled for the September 11, 2017, in which medical leave would be extended until September 18, 2017. I gave my employer a copy

3. <u>Description:</u> Dr. Kim September 11, 2017 letter

   <u>Date(s):</u> September 11, 2017

   <u>Nature and Content:</u> This is the letter filled out by Dr. Kim certifying that I was seen on September 11, 2017. Furthermore, it explicitly states that I would not be able to return to work until September 18, 2017, in a limited capacity. I gave my employer a copy

4. <u>Description:</u> Email notifying Joseph Realbuto of surgery and follow up appointments

   <u>Date(s):</u> September 5, 2017

   <u>Nature and Content:</u> This email contains proof of notification to superiors regarding surgery, doctor-ordered medical leave, and the future appointment on September 11, 2017. This documentation also shows that I was at work for one day, on September 12, due to feeling of responsible for the mounting tasks, prior to receiving the adverse disciplinary action on September 13, 2017.

5. <u>Description:</u> Performance Improvement Plan (PIP) from Joseph Realbuto

   <u>Date(s):</u> September 13, 2017

   <u>Nature and Content:</u> This is the adverse disciplinary action given to me arbitrarily on September 13, 2017. The PIP claims to have been developed after several conversations between me and Mr. Realbuto, but there is no ancillary documentation to prove that this

was the case. The purpose of this unprecedented and baseless letter is clear in the final sentence that is bolded and underlined: "If Martha meets these objectives but later reverts back to unsatisfactory performance, she may be terminated without future warning." After almost fourteen years working with Seven Hills without a single disciplinary record, this adverse disciplinary action was malicious, baseless, and without precedent.

6. Description: Seven Hills Foundation Administrative Policy #321

   Date(s): September 13, 2017

   Nature and Content: This is the Performance Management Policy that was in effect during the aforementioned events in September 2017. It explicitly details the responsibilities of supervisors and employees and provides guidance on necessary steps the supervisor must take during the performance management process. These steps begin in page 1 of Addendum A. Based on this policy written by Seven Hills, there are a multitude of steps that must be taken prior to receiving an "Individual Development Plan," none of which were taken by Mr. Realbuto. It is worth noting that the Performance Improvement Plan (PIP) created by Mr. Realbuto was never mentioned in this policy, further bringing into question its legitimacy and reasoning. Joseph Realbuto did not follow the steps set by this policy, choosing to conveniently jump to step 9.

7. Description: Seven Hills Foundation Employee Policies and Procedures Handbook

   Date(s): September 12-13, 2017

   Nature and Content: In this handbook, on page 22, in the third paragraph, it explicitly states that Seven Hills "requires a fitness-for-duty certification before an employee returns to work after an absence during which sick time is used." I was pressured to work and subjected to adverse disciplinary action after explicitly notifying my supervisor, Joseph Realbuto, of my vulnerable medical state. Moreover,  Joseph Realbuto ignored my concern for my health and insisted I attend a meeting that conflicted with a medical appointment, all the while breaking company procedure, never asking for a fitness-for-duty certification prior to his demands.

8. Description: Tanille Louis medical summary and update following March 9, 2020 medical evaluation

   Date(s): March 16, 2020

   Nature and Content: This is a letter written by Tanille Louis, my psychiatric nurse, regarding my treatment and mental and emotional conditions. In the letter, Ms. Louis discloses that I am being treated for Anxiety, Major Depressive Disorder, and PTSD. Ms. Louis provides a summary of my state as of my March 9, 2020 visit and concludes that I am unable to work due to the aforementioned diagnoses.

9. <u>Description:</u> Silvia Franco letter regarding mental state and synopsis of therapy

<u>Date(s):</u> March 18, 2020

<u>Nature and Content:</u> This letter is written by Silvia Franco, my therapist, regarding the history of my treatment and providing a summary of my mental and emotional state. The letter describes the claims of this complaint, which occurred in September 2017, as "another situation that sent Ms. Rivera into a deep depression, with generalized anxiety, panic attacks and reactivation of post-traumatic stress disorder symptoms." According to Ms. Franco, there is a direct and causal correlation between the events that transpired in September of 2017 and my current, unpredictable and unbearable state.

10. <u>Description:</u> Dr. Nancy Berube letter

<u>Date(s):</u> March 18, 2020

<u>Nature and Content:</u> This is a letter written by Dr. Berube, my primary care physician since 2008. Dr. Berube has been treating me for PTSD, Anxiety, Depression since September 2, 2017—a mere 11 days prior to the arbitrary adverse disciplinary action. Dr. Berube concludes that the symptoms caused by Seven Hills Foundation persist and that I am unable to work, as of the writing of the letter.

11. <u>Description:</u> Dr. Zamir Nestlebaum Impartial Physician Examination

<u>Date(s):</u> March 29, 2019

<u>Nature and Content:</u> Judge Paul. F. Benoit appointed Zamir Nestlebaum, M.D., to conduct an Impartial Physician Examination of my mental and psychiatric state. Dr. Nestlebaum provides his assessment and concludes his report with "yes" or "no" answers to direct questions regarding my emotional and mental disability.

Dr. Nestlebaum concludes "yes" on the following questions:

1. Did the employee have an emotional/mental condition that caused him/her to be disabled?"
2. "Did the emotional or mental disability have as its predominantly contributing cause an event or series of events occurring within the employment?"
3. "On what date did the alleged event or series of events occurring within the employment first become a predominant cause of disability?" – "2014"
4. Does the alleged event or series of events occurring within the employment remain a predominant cause of disability or need for treatment?

It is clear, through Dr. Nestlebaum's professional assessment, that my disabilities and the pain I have endured have been directly caused by Defendants.

12. <u>Description:</u> September 2017 Earnings Report

Date(s): September 21, 2017

Nature and Content: This is an original Earnings Report from 2017. The amount I am seeking, as can be seen in my relief, is calculated using the hourly rate earned in September of 2017 plus emotional and punitive damages, and out-of pocket expenses.

13. Description: Tanille Louis Update of Condition and Symptoms

Date(s): September 21, 2020

Nature and Content: This letter contains an update by Ms. Louis from my meeting with her on September 18, 2020 in which I underwent a medical evaluation. The same symptoms and medications persist from the March 16, 2020 evaluation.

14. Description: Silvia Franco updated letter

Date(s): September 25, 2020

Nature and Content: This letter contains an update by Ms. Franco concluding the persistence of my symptoms, caused by Seven Hills, mentioned in the March 18, 2020 letter.

15. Description: Dr. Nancy Berube updated letter

Date(s): September 21, 2020

Nature and Content: This letter contains an update by Dr. Berube concluding the persistence of my symptoms, caused by Seven Hills, mentioned in the March 18, 2020 letter.

16. Description: Copy of Charge of Discrimination against Seven Hills Foundation and Affiliates

Date(s): May 31, 2018

Nature and Content: This is a copy of the Charge of Discrimination filed in The Commonwealth of Massachusetts Commission Against Discrimination.

Exhibit #  1

RIVERA,MARTHA
A# W00424082139 SDC F
ATT MD: Kim,David C (RMG)
MR# W005019382 55  01/27/62
09/06/17
SPCOSM

**Saint Vincent Hospital**
**SAME DAY SURGERY**

**Patient Education Sheet**
This form is not meant to replace the specific instructions you will
receive from your doctor.  Read all instructions carefully.

Patient's Name: _____
Doctor's Name: _____ Dr. Kim _____
Doctor's Phone: _____ 508-368-3199 _____
Emergency Contact: _____ 508  363  6025 _____

**DIET:** You may resume your usual diet by _____ Today _____.
NO ALCOHOLIC BEVERAGES FOR 24 HOURS AFTER SURGERY
AND/OR 24 HOURS AFTER TAKING PRESCRIPTION PAIN MEDICATION.

**ACTIVITY:**  Rest today.  Resume light activities tomorrow.  No heavy lifting, bending, stooping or straining until
seen by your physician.  Walking and stairs are good for you when done in moderation.

You may shower in _____ 48 hrs _____.  You may drive in _____ when advised by dr _____

**WOUND CARE:**  ☑ Keep area clean and dry _____ for 48 hrs _____
☑ Dressing may / ~~may not~~ be removed _____ in 48 hrs _____.
☑ Apply ice compresses for comfort.

IF YOU NOTICE ANY REDNESS, SWELLING, DRAINAGE, OR IF YOU DEVELOP
A FEVER, HAVE ANY QUESTIONS OR PROBLEMS - CALL YOUR DOCTOR.

**SPECIAL INSTRUCTIONS:** _____ Wear binder until advised _____

**MEDICATIONS:**  DO NOT take any aspirin-like products (i.e., Advil, Nuprin, Motrin, Aleve) unless directed.
Extra Strength Tylenol is usually sufficient for pain.  If you are taking medications at home,
continue taking them as your doctor has instructed you.

Call doctor's office for appointment if not already scheduled.  Follow up off.

_Keep appt already scheduled_

**THIS INFORMATION HAS BEEN EXPLAINED TO ME AND I UNDERSTAND ITS CONTENT.**
Patient or Responsible Person's Signature: _____ Martha Rivera _____
Nurse's Signature: _____ Chassett, R _____  Date: _____ 9-6-17 _____

Exhibit # 2


RELIANT
MEDICAL GROUP

Martha Rivera
24 Belair Heights
Leominster MA 01453

8/1/2017

Dear Martha Rivera,

Per our conversation, this is to remind you of your upcoming appointment

Provider: **Wmc Misc Plast Nurse 1,**
123 Summer St
Suite 570
Worcester, MA  01608-1216
Date:  9/11/2017 Time: **8:30 AM**
Appt Dept. WORCESTER MEDICAL CTR NEW ENGLAND PLASTIC & AESTHETICS           For: POST
POST - OPERATIVE VISIT

Special instructions: _____

_____

_____

**Please keep the following in mind when visiting Reliant Medical Group:**
*All patients will be asked to provide their insurance card(s) and Photo ID at check-in.
*Please be prepared to make your co-payment at time of check-in.
*Credit cards (Master Card, Discover & Visa) as well as cash or check are accepted for payment.
*Please bring a list of your current medications with you.

If for any reason you are unable to keep this appointment, please contact the office at 508-368-3199 to reschedule.

Sincerely,

Patient Services Specialist for Wmc Misc Plast Nurse 1,

*Note. If you know you will miss an appointment, please cancel at least 24 hours in advance. This will allow us to accommodate other patients who need to be seen.  Please be aware that repeated failure to appear for scheduled appointments without canceling with 24 hours' notice may lead to dismissal from Reliant Medical Group/Southboro Medical Group*

Exhibit #  3



**RELIANT**
**MEDICAL GROUP**
PLASTIC &
RECONSTRUCTIVE SURGERY

9/11/2017

Martha Rivera
24 Belair Heights
Leominster MA 01453

TO WHOM IT MAY CONCERN:

This is to certify that Martha Rivera was seen in my clinic on 9/11/2017.

She is able to return to work on 9/18/17 and without heavy lifting more than 10 lbs for 2 wks.

Please feel free to contact my office if you have any questions or concerns.  Thank you for your assistance in this matter.

Sincerely,

David Kim, MD
WORCESTER MEDICAL CTR NEW ENGLAND PLASTIC & AESTHETICS
123 Summer St
Suite 570
Worcester MA 01608-1216
Dept Phone: 508-368-3199

Electronically Signed.

Exhibit #  4

From: Rivera, Martha MarthaRivera@sevenhills.org    Document 1-2    Filed 01/15/21    Page 12 of 79
Subject: Fwd: Open position and ....RE: Brochures, Schedule, meeting
Date: September 20, 2017 at 9:38 PM
To: luliayurgaqui@gmail.com



Martha Rivera

Begin forwarded message:

**From:** "Realbuto, Joseph" <JRealbuto@sevenhills.org>
**Date:** September 5, 2017 at 12:33:01 PM EDT
**To:** "Rivera, Martha" <MarthaRivera@sevenhills.org>
**Subject: Re: Open position and ....RE: Brochures, Schedule, meeting**

Excellent thanks!

Sent from my iPhone

On Sep 1, 2017, at 2:17 PM, Rivera, Martha <MarthaRivera@sevenhills.org> wrote:

Hello Joe,

The brochure box is open but complete!!

I have attached the time off request and the doctor documentation, will be out from Wednesday 9/6/17, Thursday 9/7/17 and Friday 9/8/17; I entered in my request Monday 9/11/17 because I will have the follow up and I don't know how long will it take.

Thank you,

Martha Rivera, CBIS
Program Manager
ASPIRE!

Community Based Day Supports Program
22 Grant Road
Devens, MA 01434
martharivera@sevenhills.org
Phone: 978- 391-8221
FAX· 978-772-7175
www.sevenhills.org


Martha,
I am still unclear when you will be out and for how long.   I am going to be at your program on 9/7 to meet with Karen Ryan.  Are you going to be there?
Please do get the brochures back and do not distribute to anyone.
Thanks
Joe
<Martha R. time off request 9-1-17.pdf>


Thank you

Martha Rivera

From: **Rivera, Martha** MarthaRivera@sevenhills.org
Subject: **Fwd: Week schedule**
Date: **September 20, 2017 at 9:39 PM**
To: tuliayurgaqui@gmail.com



Martha Rivera

Begin forwarded message:

> From: "Realbuto, Joseph" <JRealbuto@sevenhills.org>
> Date: September 5, 2017 at 12:26:39 PM EDT
> To: "Rivera, Martha" <MarthaRivera@sevenhills.org>
> Subject: Re: Week schedule
>
> Thanks Martha
>
> Sent from my iPhone
>
> On Sep 5, 2017, at 7:26 AM, Rivera, Martha <MarthaRivera@sevenhills.org> wrote:
>
>> Good Morning Joe,
>>
>> I have to go for blood work, I'll let you know as soon as I get to the program.
>>
>> Week Schedule,
>>
>> |  | 09/04/17 | 09/05/17 | 09/06/17 | 09/07/17 | 09/08/17 |
>> |---|---|---|---|---|---|
>> |  | **Monday** | **Tuesday** | **Weds** | **Thursday** | **Friday** |
>> | **Martha Rivera** | Holiday | ASPiRE!-Devens | OFF | OFF | OFF |
>>
>> Thank you,
>>
>> Martha Rivera, CBIS
>> Program Manager
>> ASPiRE!
>> Community Base Day Supports Program
>> 22 Grant Road
>> Devens, MA 01434
>> Phone: 978-391-8221
>> Fax: 978-772-7175
>>
>>
>> This message is intended for the use of the person or entity to which it is addressed and may contain information that is confidential or privileged, the disclosure of which is governed by applicable law. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this information is strictly prohibited. If you have received this message by error, please notify us immediately and destroy the related message.
>> -------------------------------------------------------------

This message is intended for the use of the person or entity to which it is addressed and may contain information that is confidential or privileged, the disclosure of which is governed by applicable law. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this information is strictly prohibited.

Exhibit #  5

TO:     Martha Rivera
FROM:   Joseph Realbuto, VP of ASPiRE!
DATE:   September 13, 2017
RE:     Performance Improvement Plan

The following Performance Improvement Plan* (PIP) was developed following several conversations with Martha and review of areas in the program which are not complete, therefore affecting the success of the program for the participants supported.

| Objective/Area in Need of Improvement | Narrative/Summary | Review Date/Due |
|---|---|---|
| Martha will have completed Individual Program Files for each individual attending Devens CBDS | All of the Individual Program Files are incomplete. Martha will be trained by peer staff (clinical director) in what should be included in the program file and then will develop a completed file for each individual. | Review monthly<br><br>Completion Day: October 16, 2017 |
| Martha will develop an individualized schedule for each participant attending the program. | Martha currently has a Basic Schedule for all participants. An individualized schedule of daily activities needs to be developed. | Review monthly<br><br>October 2, 2017 |
| Martha will develop an individual program plan for each individual attending the program. | Program Goals/Objectives are currently not in place for all participants. Martha will work with team to develop an individual program plan with goals and objectives. | Review monthly<br><br>October 2, 2017 |
| Martha will ensure that data is collected for each individual for all goal related activities. | Martha will establish a data collection system that is used for each individual by all staff conducting goal related activities. | Review monthly<br><br>October 2, 2017 |
| Martha will treat all staff with dignity and respect in all areas of communication. | It has been brought to my attention at least on two instances that Martha has been disrespectful (yelling in a loud tone) to employees in which she supervises. Martha, at all times, needs to be aware and respectful of staff. | Ongoing |

This PIP will be reviewed with Martha on or about the dates noted above. If Martha does not meet the objectives stated above, she may be subject to disciplinary action, up to and including termination. If Martha meets these objectives but later reverts back to unsatisfactory performance, she may be terminated without further warning.

**Comments:**

_____

_____

_____

_____

_____

I have read and understand the Performance Improvement Plan.  Working with Clinical Director, Vice President of ASPiRE! and other management staff,   Martha will address areas outlined in the Performance Improvement Plan.

Refused                                                    Joseph Realbuto                      9/13/17
_____        _____        _____        _____
Martha Rivera, Program Manager, Devens CBDS        Date        Joseph Realbuto, Vice President, ASPiRE!        Date

                                                    witnessed    _____        9/13/17

*A copy of this PIP will be placed in personnel file.

Exhibit #  6

SEVEN HILLS FOUNDATION
ADMINISTRATIVE POLICY # 321

Effective:                                                   10/2012; 10/14; 12/15
Functional Responsibility:                       All Supervisory Staff
Cross Reference(s):

<u>TOPIC</u>:  Performance Management Policy

<u>POLICY</u>:  Seven Hills Foundation strives to provide an environment where employee performance is aligned with organizational objectives and where all employees are provided with an opportunity for ongoing personal and professional growth.  In order to achieve this goal, Seven Hills' management will implement and administer the performance management process outlined in this policy.

The performance management process is a continuous process as we plan, manage and review performance.  The purpose of the performance management process is to provide employees with a clear understanding of the work expected from them, to provide ongoing feedback regarding how they are performing, to identify opportunities for recognition when appropriate, to identify opportunities for personal and professional development and to address performance areas that do not meet expectations.

Performance management is an interactive process.  Both supervisor and employee are responsible for actively participating in this process.

Supervisors are responsible for:

- Thoroughly explaining job responsibilities to employees.
- Reviewing the job description with each employee at the time of hire and annually thereafter.
- Meeting with employees regularly to determine how they are performing and to provide ongoing and continuous feedback regarding performance.
- Soliciting feedback and input from employees.
- Providing employees with clear performance expectations.
- Accurately documenting performance discussions as outlined in this policy.
- Promptly addressing performance that does not meet expectation and taking corrective action as required.
- Monitoring and evaluating work performance.
- Initiating performance evaluations on a timely basis for each employee.
- Working with employees to provide time and resources necessary to receive the required trainings.
- Assisting employees in the undertaking of training and development opportunities that align with the program/department goals and where possible support other career development opportunities.

1

- Notifying Human Resources in the event that an employee is not meeting performance expectations prior to the end of orientation or performance evaluation period.

Employees are responsible for:

- Actively participating in performance management discussions.
- Reading their job descriptions and asking questions when appropriate.
- Completing all required trainings.
- Soliciting assistance from their supervisor when necessary.
- Consulting with the supervisor if job expectations are not clear.
- Completing self-assessments when required.
- Consulting with their supervisor, seeking advice and expressing their views about any aspect of work.
- Providing input on performance objectives and plan performance enhancement strategies.
- Participating in an annual performance review.

Any questions regarding this policy should be directed to the Human Resources Office.


_David A. Jordan_

David A. Jordan, DHA, President


Authorized by the SHF Board of Directors this 1st day of December 2015.


_Melvin P Jordan_

Clerk of the Board

2

## PERFORMANCE MANAGEMENT GUIDELINES

The performance management process involves ongoing discussions between the employee and supervisor.  Below is a summary of the process:

1. Upon hire, transfer or promotion to a new position, the employee and the supervisor will meet to discuss the employee's job responsibilities, review the employee's job description, review expected outcomes, and set performance objectives for the review period. During this initial meeting, the supervisor should review the evaluation standards that are used during the performance evaluation process.  This meeting can also be used to identify plans for training or development and for future performance planning.

2. During the initial orientation period, the supervisor must meet with the employee on a monthly basis.  An "Employee Coaching &Support Session" form must be utilized to document these meetings.  (Form* A, B).  This form is signed by both the supervisor and the employee and is kept at the program/department location in a locked file.  The employee should be provided with a copy of this form.

3. If two consecutive employee support sessions indicate substandard performance in the same performance area or three sessions with substandard performance in differing areas, the supervisor should consult with his/her supervisor and/or Human Resources to discuss options to assist the employee with getting back on track and to ensure proper documentation of these efforts.

4. After an employee has completed the initial orientation period it is highly recommended that the supervisor continue to meet with the employee on a monthly basis but no less than quarterly.  The "Employee Coaching & Support Session" form will be used to document these meetings. This form is signed by both the supervisor and the employee and is kept at the program/department location in a locked file.  The employee should be provided with a copy of this form.

5. At the end of the orientation and/or annual cycle, the employee's supervisor will provide the employee with a "Performance Self-Assessment" form (Form* E) prior to completing the employee's performance evaluation. The employee will be provided with a reasonable period of time to complete the form and return it to the supervisor.

6. If multi-rater feedback is required for your employee, based on his/her position and program, tools have been developed to assist the evaluator in obtaining feedback from internal and external stakeholders.  The forms may be provided directly to the person we are seeking input from or they may be used to consolidate feedback obtained from persons or families served. Supervisors should consult with his/her supervisor or the Director of Quality Assurance/Program Improvement regarding the established tools available to collect feedback regarding the employee's performance.

7. The supervisor will complete a "Performance Evaluation" form (Form* F,G,H,I) assessing the employee's progress towards meeting evaluation standards and previously defined expectations.

* All Forms are located on iCIMS

8. Once the supervisor completes the performance evaluation and collects the self-assessment, he/she will compare the documents and ensure the performance evaluation addresses any of the employee's concerns. For example, if the employee expresses an interest in certain classes or trainings, the supervisor acknowledges and addresses this interest.

9. The supervisor, with input from the employee, will develop an "Individual Development Plan" (Form* J). The individual development plan is intended to assist the employee to develop, enhance, or maintain their skills. However, an objective must be developed for any standard(s) rated as "*Does Not Achieve Performance Standards*".

10. The supervisor will schedule a time to meet to review the "Performance Evaluation" in private. This will be a dynamic meeting where both the employee and supervisor will have an opportunity to discuss the evaluation and the employee will be allowed an opportunity to provide feedback. The supervisor should set enough time aside to give the employee his/her undivided attention. The following documents will be discussed at the meeting:

   - The Performance Evaluation and the employee's self-assessment.
   - The employee's job description will be reviewed annually, with the review documented in the performance evaluation.
   - The Individual Development Plan will be reviewed and the supervisor will add any development ideas agreed upon as a result of the discussion.

## USING OTHER FEEDBACK TOOLS DURING THE PERFORMANCE EVALUATION PROCESS

Feedback from internal and external stakeholders regarding employee performance may be required in some programs. Such feedback can provide valuable information which can be used for employee development purposes. This feedback benefits both the employee and the organization:

Benefits to the employee:

   Perception at times is reality and this process helps employees understand how others perceive them
   Disclose concerns regarding the employee's performance which he/she is unaware of
   Feedback is essential for learning
   Individuals can better manage their own performance and careers based on feedback provided by others
   May provide information on soft skills  (attitude, communication, listening skills)

To the organization:

   Reinforce our culture by linking feedback items to organizational leadership competencies and organizational values

\* All Forms are located on iCIMS

Better career development for employees
Improves quality and customer service by having persons served, family members or other stakeholders provide their input and contribute to the evaluation process
Identify relevant training topics to develop staff and/or improve service delivery

Where this feedback is a requirement, tools have been developed to assist the evaluator in obtaining feedback from internal and external stakeholders. The forms may be provided directly to the person we are seeking input from or they may be used to consolidate feedback obtained from persons or families served. Supervisors should consult with his/her supervisor or the Director of Quality Assurance/Program Improvement regarding the established tools available to collect feedback regarding the employee's performance.

## TIMING OF PERFORMANCE MANAGEMENT MEETINGS

1. During an employee's orientation period, supervisors must meet with employees on a monthly basis. The "Employee Coaching & Support Session" form (Form* A, B) will be used to document these meetings. This form is signed by both the supervisor and the employee and is kept at the program/department location in a locked file. The employee should be provided with a copy of this form.
2. During the performance management cycle and after the completion of the employee's orientation period, the supervisor will continue to meet with the employee regularly to review his/her performance and to provide the employee with an opportunity to provide feedback, solicit support and ask questions.
3. A "Performance Evaluation" will be completed at the end of a new employee's orientation, upon completion of his/her first year of employment and annually thereafter.
4. All performance evaluations will be completed during the performance evaluation window.
5. If an employee is promoted and/or transfers from one position to another, the employee will have a new orientation period and will receive a performance evaluation at the end of the orientation. Thereafter, his/her annual evaluation will be conducted during the evaluation window for his/her new position.

## ONBOARDING YOUR NEW EMPLOYEE

Onboarding refers to the process of acclimating new employees to the organization. Providing communication, training and resources to new employees is extremely important for the successful adjustment of the employee. At the time an offer of employment is made and accepted, prospective new employees will be provided with a general overview of the position, program/department and their job responsibilities.

Whenever possible, a supervisor should be present to welcome the new employee to the program and to introduce him/her to other employees. A more experienced employee may be assigned to help orient the employee to the program/department,

＊ All Forms are located on iCIMS

other employees and persons supported; however, it is the supervisor's responsibility to see that this is done.  More specifically, during the first few days of employment, the supervisor will ensure that the following takes place:

- The employee is welcomed to Seven Hills and oriented to his/her position, program and job responsibilities.
- The job description for the position is reviewed and a signed copy is sent to Human Resources or designated area office to be placed in the personnel file.
- An on-site program specific orientation takes place.
- The employee is notified of any core training requirements and upcoming scheduled trainings.
- Program specific policies and procedures are reviewed.
- The employee has received Seven Hills Employee Policy and Procedure Handbook and that the employee has reviewed the handbook.
- The employee is made aware of work expectations, performance criteria, the performance management process and organization standards.

The supervisor will develop an Onboarding Plan for the program/department geared towards helping new employees become acclimated to Seven Hills and the program/department to ensure the employee feels welcomed upon arrival.

A template has been created for supervisors to outline their onboarding process. Supervisors are reminded that effective onboarding will improve on the job performance.  It accelerates the time it will take the new employee to become acclimated to their position, the environment, our culture, work styles and job expectations.  Therefore, supervisors are encouraged to develop a plan for their new employees prior to their first day of employment.  (Form* K).

## EMPLOYEE SUPPORT SESSIONS

The purpose of the employee support session is to provide continuous feedback and support to employees.   Feedback should be continuous and ongoing and need not be part of a scheduled meeting.  At a minimum however supervisors should meet with the employees on a monthly basis to make certain that they are engaging in ongoing performance dialogue.  "Employee Support Session" form must be utilized to document these meetings.  (Form* A,B).

A supervisor and employee checklist has been developed (Form* C,D) to assist both supervisor and employees.  The checklists contain many of the items that supervisors and employees may wish to discuss during a support session.  The checklist is not all inclusive and is meant to provide employees with a variety of topics which may and in some cases should be addressed in a support session.  Some items may not be applicable to all employees and/or other items may only need to be addressed on a quarterly or annual basis.

\* All Forms are located on iCIMS

Supervisors should discuss performance problems with their immediate supervisor and/or Human Resources before the problem becomes too severe. Generally, two consecutive Employee Support Sessions that indicate substandard performance in the same performance area or three sessions with substandard performance in differing areas may suggest a performance problem. This notification to a supervisor and/or Human Resources is to discuss options to assist the employee in improving performance.

## WRITTEN PERFORMANCE EVALUATION FORM

The written performance evaluation is an opportunity for the supervisor and employee to review the degree to which previously discussed performance expectations and objectives have been met, to discuss professional development opportunities, and to identify options for acquisition of additional skills and knowledge to foster career growth.

The process is designed to primarily help employees do a better job. It is very important that employees know exactly where they stand in relation to their performance and established standards. An employee is done a disservice by an evaluation that is non-specific, does not address areas in need of improvement or is unduly harsh. The comments and ratings should recap your employee support session meetings, and any prior coaching and performance conversations throughout the preceding year or orientation period.

The "Performance Evaluation" shall be written and shall include:

- Comments on overall performance during the performance period, feedback on any areas of achievement and any areas in need of improvement.
- Comments and ratings on specific professional and organization standards and overall performance in relation to previously established outcomes and objectives.
- Any trainings, additional skills and/or responsibilities the employee has acquired during the evaluation period.
- A review of the current job description.
- A review of the Self-Evaluation Assessment.
- Future plans and objectives. (See Individual Development Plan section below)
- Signatures of the employee and the supervisor, and his/her supervisor if applicable.

Supervisors are also encouraged to address the following in the written performance evaluation:

- Identify opportunities for professional development and options for acquiring additional knowledge and skills to support career growth.
- Outline future steps necessary to meet professional development and job-related goals.

\* All Forms are located on iCIMS

The employee shall be given a copy of the final performance evaluation and be permitted the opportunity to respond either orally or in writing. The employee must be asked to sign the evaluation and a current job description, if the job description has been modified in any way.  The performance evaluation document shall be placed in the personnel file.

When necessary, the supervisor will notify Human Resources or designee that the performance evaluation has been completed and the performance evaluation database will be updated accordingly.

## PERFORMANCE EVALUATION STANDARDS

All Seven Hills employees will be rated on the following organizational and professional standards.  Key behaviors which exemplify each standard are listed below.

**Reliability** – The employee adheres to work schedules and carries out all aspects of their job requirements and assignments with minimal direction.

> Key Behaviors:

- Adheres to work schedule.
- Avoids excessive absences.
- Employee meets punctuality and attendance expectations.
- When necessary, follows call-in procedures and informs others of absences.
- Carries out job duties, responsibilities and assignments in a timely manner.

**Quality** – The employee demonstrates pride and a high level of quality in their work, which serves as an example to others.

> Key Behaviors:

- Demonstrates high level of quality in their work.
- Engages in continuous quality improvement.
- Models quality work and serves as an example to others.
- Produces work and documentation that is accurate and dependable.
- Produces work that is thorough and organized.
- Work is consistent with acceptable quality & regulatory standards.

**Teamwork** – The employee promotes effective working relationships and works effectively as part of the work group to facilitate the team's ability to meet its goals and objectives.

> Key Behaviors:

- Works cooperatively with team members.

✱ All Forms are located on iCIMS

- Adjusts as needed to facilitate the team's ability to meet its goals and objectives.
- Remains open and flexible when faced with differing views and opinions.
- Promotes and maintains positive relationships at work.
- Fosters a positive, harmonious and inclusive work environment.

**Supporting the Mission** – The employee supports the organizational mission in his/her individual and team efforts and demonstrates a high level of respect for others.

Key Behaviors:

- Demonstrates respect and acknowledges the value of others.
- Understands organizational mission and exemplifies such in his/her individual contributions, respect for others and team efforts.
- Delivers culturally competent care and services.

**Communication** – The employee delivers clear and effective verbal and written communications in a professional manner and takes responsibility for understanding others.

Key Behaviors:

- Utilizes strong listening skills to formulate direct, responsive answers to questions.
- Clarifies the meaning and intent of others' communications when it is unclear.
- Creatively identifies and utilizes effective communication channels and methods.
- Keeps supervisor and others informed of the status of work, assignments, projects and activities.
- Organizes and expresses ideas clearly.
- Uses writing effectively to create/complete documents using appropriate style, spelling, grammar and punctuation.
- Employee communicates effectively with team, supervisor and other stakeholders based on the needs of the individual, group or project.

**Initiative** – The employee actively and consistently participates and works to implement progressive concepts to improve job specific and or team performance; capitalizes on opportunities to learn and accomplish more and directs efforts toward completion of responsibilities.

Key Behaviors:

- Takes responsibility for own actions and performance.
- Seeks to improve job and team performance.
- Capitalizes on opportunities to do more, to learn and make improvements to self, team and work environment.
- Directs efforts towards completion of responsibilities.

\* All Forms are located on iCIMS

- Shows active and consistent participation and engagement.

**Knowledge/Skills/Performance** – Employee demonstrates a thorough understanding of job duties and responsibilities; integrates knowledge efficiently to perform job requirements and completes all job duties and responsibilities.

Key Behaviors:

- Demonstrates the knowledge and specific skill competencies in meeting the requirements of his/her position measured against their formal job description and standards established in comparable industry position.
- Demonstrates a depth of judgment, knowledge and technical skill important for the position.
- Exercises good judgment in all aspects of the execution of job duties.
- Effectively uses resources (including management, supervisor, HR, business office, Corporate College, IT Dept., etc.) to obtain additional knowledge and remain current with any changes in his/her respective field or area of responsibility.
- Accurately assesses problems and effectively arrives at solutions.
- Completes all job duties and responsibilities.
- Completes trainings as required.
- Capitalizes on opportunities to expand/improve skills through training (internal/external), seminars, workshops or conferences.

**Safety** – The employee is committed to and responsible for following all organizational precautions and procedures in the performance of all job duties to ensure a safe work environment for self and others.

Key Behaviors:

- Reports unsafe work conditions or behavior to supervisor or management team in a timely manner.
- Corrects unsafe work conditions as directed.
- Follows all safety policies and practices.
- Promotes safety in the work environment.
- Where applicable, practices universal precautions.
- Where applicable, adheres to established medication administration protocol.

**Professionalism** – Employee displays a high degree of professionalism and integrity; responds positively to changes in the work environment in a manner that promotes the goals and objectives of Seven Hills.

Key Behaviors:

- Gains the trust of others by taking responsibility for own actions and telling the truth.

\* All Forms are located on iCIMS

- Respects and maintains confidentiality.
- Displays high degree of professionalism in all aspects of his/her job.
- Considers and responds appropriately to others.
- Adheres to organizational standards, policies and procedures.
- Commits to satisfying internal and external customers courteously and efficiently
- Manages change effectively and remains open and flexible when faced with differing views, changes in work environment and challenges.
- Responds professionally to change in the work environment.
- Maintains acceptable boundaries with others at all times.

**Time Management** – The employee effectively uses work time to accomplish assignments and demonstrates the ability to seize opportunities to enhance efficiencies in their work and work environment.

Key Behaviors:

- Employee adheres to his/her work schedule.
- Manages time in order to accomplish tasks and assignments as required.
- Meets or exceeds work established deadlines or communicates inability to meet established deadlines.
- Engages self in productive work efforts, whenever possible.
- Meets work production goals and objectives.
- Demonstrates ability to multi-task.
- Efficient yet thorough.

*NOTE: In addition to the organizational and professional standards listed above, all supervisors will be rated on the following standards.*

**Team Building** – The supervisor provides direction and leadership to help teams achieve goals and operate cooperatively and cohesively.

Key Behaviors:

- Demonstrates the capacity to maintain the work group's direction and consistency in meeting the team's defined objectives.
- Encourages staff to work as a team.
- Establishes direction for projects and assignments for team members.
- Assists group members to understand their roles and responsibilities.
- Assists the group by effectively using each individual's talents and contributions.
- Provides guidance when the team is off track.
- Helps identify and remove organizational barriers and identifies resources for the team.
- Champions the team within the organization.

**Talent Management** – The supervisor effectively manages human resources in assigned program/department as demonstrated in his/her recruitment and selection practices, labor and employee relations, performance management, employee retention and engagement and quality of services provided by his/her department.

Key Behaviors:

- Monitors both quality and quantity of performance and services provided by staff.

- Sets well defined outcomes and expectations for work activity and tracks progress.
- Adjusts work activity and desired outcomes based on organizational strategy.
- Addresses performance problems promptly and issues appropriate disciplinary action if necessary.
- Holds themselves and staff accountable.
- Gives performance feedback regularly to staff supported.
- Completes performance evaluations in a timely manner.
- Actively participates in the recruitment and selection of qualified individuals for his/her program/department.
- Maintains positive employee relations.
- Effectively manages conflict.
- Leads and manages an inclusive workplace that maximizes the talents of each person.
- Respects, understands, values and seeks out individual differences to achieve team mission and goals.
- Actively identifies and implements retention strategies in order to reduce avoidable turnover.
- Monitors adherence to policies and procedures and responds accordingly.
- Delegates authority as appropriate.
- Counsels and facilitates performance improvement as needed.
- Supports programs and activities that promote employee well-being such as health and safety.
- Leads by example and is a good role model.
- Engenders confidence in his/her ability to lead.
- Demonstrates empathy (ability to listen, understand and share the feelings of those in their work group); expresses personal support for subordinates in their work; and expresses confidence in their ability to perform effectively and to meet challenges.

**Planning and Organizing** – The supervisor works in an organized manner, uses time effectively, meets commitments and responds to stakeholder needs. The supervisor utilizes effective problem solving techniques.

Key Behaviors:

✻ All Forms are located on iCIMS

- Analyzes workload, establishes realistic work and program goals, and meets deadlines.
- Demonstrates effective time management of self and that of staff.
- Accurately assesses problems and solutions.
- Makes decisions in a timely manner.
- Focuses on desired results; sets and achieves goals.
- Builds alliances and enlists support from others when needed.
- Effectively manages use of resources, including technical, financial and operational.
- Participates in strategic planning process as necessary.

**Resilience and Change Management** – The supervisor encourages innovation and positive change in services; exhibits ability to manage change constructively. The supervisor effectively communicates the reason/need for change, involving others in the process and assessing the impact of change.

Key Behaviors:

- Responds quickly to change and easily considers new approaches.
- Anticipates reactions and objections to change and plans how to overcome them.
- Positively assists staff to understand and respond to change.
- Takes the steps necessary to understand changes in internal and external environment.
- Researches and identifies "Best Practices" and implements accordingly.
- Open to new ideas and perspectives.
- Supports new systems and procedures.
- Models flexibility.
- Considers and responds appropriately to the needs and feelings of others in different situations.

**Developing Self and Others** – The employee builds his/her professional skills and competencies and improves work performance; employee encourages the continuous development of his/her staff.

Key Behaviors:

- Models and motivates personnel to pursue continuous personal and professional improvement.
- Nurtures talent and coaches for high performance.
- Consistently seeks out opportunities for growth and development.
- Continuously engages in self-reflection and identifies areas in need of improvement.
- Invests the time and resources to learn/develop self.
- Invests the time and resources to assist employees in identifying learning and development opportunities.

\* All Forms are located on iCIMS

- Provides others with tools and approaches to solve problems and improve processes.
- Regularly assesses individual and team performance in order to identify opportunities for growth and improvement.

**Resource Management** – Employee demonstrates the ability to manage and leverage financial resources, information technology, building facilities and external resources in support of the organization's mission and objectives.

Key Behaviors:

- Demonstrates the ability to estimate, justify and manage appropriate funding levels to support the program/department's mission.
- Identifies cost-effective approaches.
- Ensures that self and staff are trained and competent in utilizing existing and new information technology.
- Understands and utilizes internal and external resources to achieve objectives.

**Leadership** – The leader creates a climate of trust and mutual respect; increasing the potential for employees to be productive and to feel welcome, valued, and motivated.

Key Behaviors:

- Aligns practices with the mission and values of the organization, and discusses them with their teams regularly.
- Exhibits ethical leadership and models the conduct they expect from those they lead.
- Performs duties with honesty, accountability, fairness and professionalism.
- Undertakes efforts to create a workplace climate reflective of dignity and respect.

*NOTE: Senior managers including but not limited to Assistant Vice Presidents, Chief Financial Officer, Chief Learning Officer, Chief Information Officer, Program Directors will be evaluated on all of the standards listed above (organizational, professional, supervisor) and the following:*

**Vision** – The senior manager possesses the ability to articulate a compelling vision or pictures of the future, pertaining to their work group, and how that vision is consistent with the broad values and mission of Seven Hills Foundation.

Key Behaviors:

- Sets high expectations for achieving the vision and personally demonstrates behavior and activities that symbolize and further that vision.

\* All Forms are located on iCIMS

- Possesses broad knowledge and perspective; is future oriented; can create competitive and breakthrough strategies and plans.
- Demonstrates the capacity to maintain the work group's (organization's) direction and consistency in meeting their defined strategic objectives.

**Decision Making & Critical Thinking** – The senior manager demonstrates the ability to set objectives; scan internal and external information for alternative objectives; compare and evaluate alternatives; choose, implement, and then follow-up on the decision.

Key Behaviors:

- Recognizes issues, problems, or opportunities and determines whether action is needed to advance the decision making process.
- Demonstrates the ability to maneuver through complex political situations effectively.
- Possesses the ability to skillfully negotiate in difficult situations with both internal and external groups; can be direct as well as diplomatic.
- Possesses ability to envision enhancements to a particular support service or program activity.
- Demonstrates the ability to manage and explore alternatives to the status quo.
- Looks toward the broadest possible view of an issue/challenge; thinks globally.

**Financial Oversight** – The senior manager ensures the fiscal responsibility and management of their respective work group by meeting all cost center budgets and performance/unit delivery standards.

Key Behaviors:

- Demonstrates broad understanding or principles of financial management and marketing expertise necessary to ensure appropriate funding levels.
- Prepares, justifies and/or administers the budget for the program area.
- Monitors expenditures in support of program and policies.
- Identifies cost-effective approaches.
- Uses creative approaches to maximize or leverage the use of financial resources.

**Public Relations** – The senior manager promotes positive internal and external relations by educating Seven Hills' community and surrounding external communities on the mission and work of Seven Hills and the rights and dignity of individuals with significant challenges.

Key Behaviors:

- Builds relationships within and outside the organization.

\* All Forms are located on iCIMS

- Leverages expertise and contacts to solve problems, gain knowledge or develop new business.
- Considers impact on external communities when planning program development or expansions.
- Promotes the development of positive employee relations.

Senior Leadership shall be rated on all of the professional, organizational and leadership standards.

## MANAGING UNDERPERFORMANCE

Supervisors should not wait until the end of the orientation period or annual evaluation review cycle to address underperformance issues.

- Where underperformance is identified, the supervisor sets objectives and reasonable timeframes within which improvements are to be achieved.
- The supervisor will closely monitor the work and communicate frequently with the employee.
- The employee will be provided with the opportunity and assistance to address underperformance.
- Supervisors may use the "Employee Support Session" form and/or the "Individual Development Plan" to identify objectives and timelines.
- Where there is evidence that underperformance has not been remedied through this process, the relevant formal procedures for managing unsatisfactory performance are to be followed.

## DEVELOPING AN INDIVIDUAL DEVELOPMENT PLAN

The "Individual Development Plan" (Form* J) will be utilized throughout the performance management cycle.   A development plan will be created for each employee following a performance evaluation.  A development plan may also be created for an employee, when the employee is experiencing performance problems and/or to identify goals for personal and professional development.  A copy of all development plans must be forwarded to the Human Resources Office or designated area office to be inserted in the employee's personnel file.

At the end of the annual review period:

- Supervisor and employee will have a performance planning conversation to agree on a development plan.
- The supervisor and the employee will identify performance objectives.
- The supervisor and employee will strive to identify a minimum of two goals – one that leverages the employee's strength and one that addresses an area for improvement.  Action items should be developed for each of the goals.
- The supervisor will include an objective for any standard(s) rated as "*Does Not Achieve Performance Standards*" in the Performance Evaluation.

**\*** All Forms are located on iCIMS

- The supervisor and the employee should review the plan quarterly. Progress may be documented in the "Employee Coaching & Support Session" forms.
- During the performance evaluation meeting, the supervisor and the employee will assess the employee's performance and whether the employee achieved the objectives in the prior evaluation period. The supervisor must review the last review period's Individual Development Plan document and determine whether the employee met his/her objectives. This must be documented in the new Individual Development Plan document for the current review period or in the Performance Evaluation document itself.
- The supervisor and the employee will start the next review period with a new performance development plan and/or continue goals from previous years.

To address performance problems:

- An individual development plan may be used to outline specific objectives that address ongoing performance problems.
- The objectives will be clear, unambiguous and realistic.
- Timeframes for reviewing and achieving the objectives will be identified.

## PERFORMANCE MANAGEMENT TRAINING

The Corporate College will provide training for all supervisors on the performance management policy and procedures, organizational standards, related forms and general performance management and employee development. This shall be a mandatory training for all new Seven Hills' managers and will be completed during his/her orientation period.

\* All Forms are located on iCIMS

# Performance Evaluation  Individual Development Plan

Employee Name: _____  Position: _____

Supervisor's Name: _____  Development Plan Date: _____

The Individual Development Plan is intended to assist the employee to develop, enhance, or maintain their skills. However, an objective must be developed for any standard rated as "Does Not Achieve Performance Standards."

| OBJECTIVE | STRATEGY | TIME LINE |
|-----------|----------|-----------|
|           |          |           |
|           |          |           |
|           |          |           |
|           |          |           |

Were objectives/goals established during last year's performance evaluation?  ❑ Yes   ❑ No

Was the objective/goal met?  ❑ Yes  ❑ No  Comments:_____

_____

_____

_____

Recommended professional development trainings (eAcademy, external trainings, etc.): _____

_____

_____

_____

Employee's Signature: _____  Date: _____

Supervisor's Signature: _____  Date: _____



Form J

Exhibit # 7





*defining*
# DIGNITY

## Employee Policies & Procedures

# 2016-2017
# HANDBOOK





**Affiliates**

Seven Hills Behavioral Health
Seven Hills Community Services
Seven Hills Family Services
Seven Hills Global Outreach
Seven Hills NeuroCare
Seven Hills Pediatric Center
Seven Hills Rhode Island
ASPiRE!
Children's Aid & Family Service
International Center of Worcester
Stetson School
VSA Massachusetts



## Seven Hills
Foundation

staff.sevenhills.org

| Ten or more years | 5 weeks | Up to three weeks (120 hours) |

Seven Hills Foundation believes that employees should have opportunities to enjoy time away from work to help balance their lives. Seven Hills has established this policy to ensure that eligible employees will have the ability to cash out accrued vacation time, while using at least two weeks of vacation time to assure employee well-being. Employees are accountable and responsible for managing their own vacation hours to allow for adequate vacation reserve. Employees are eligible to use the Vacation Cash-Out benefit *once* in each calendar year.

3. **Earned    Sick    Time:**

**Full-time    Benefits    Eligible Employees:** Full-time (35+ hours) regular benefits eligible employees will accrue at the rate of one (1) hour of sick time for every 30 hours worked up to 48 hours per calendar year.

**Non-benefits    Eligible Employees:** All other employees will accrue at the rate of one (1) hour of sick time for every thirty (30) hours worked up to a total of forty (40) hours of earned sick time in a calendar year. Once an employee has accrued forty (40) hours of earned sick time during the calendar year, they will not continue to accrue more time regardless of the additional hours worked.

Calendar year is defined as January 1st through December 31st.

Earned sick time is only accrued on actual hours worked, not on hours paid when not working (ex. Vacation or Personal time).

**Use of    Earned Sick    Time:**    Earned sick time may be used to:

a) care for the employee's child, spouse, parent, or parent of a spouse, who is suffering from a physical or mental illness, injury or medical condition that requires home care, professional medical diagnosis or care, or preventative medical care;

b) care for the employee's own physical or mental illness, injury, or medical condition that requires home care, professional medical diagnosis or care, or preventative medical care;

c) attend a routine medical diagnosis or care, or a routine medical appointment for the employee's child, spouse, parent or parent of spouse;

d) address the psychological, physical, or legal effects of domestic violence; or

e) travel to and from an appointment, a pharmacy, or other location related to the purpose for which the time was taken.

Use of sick time for other purposes is not allowed and may result in an employee being disciplined. Employees may not use sick time if the employee is not scheduled to be at work during the period of use. An employee may not accept a specific shift assignment with the intention of calling out sick for all or part of the shift.

Earned sick time may be used for full or partial day absences. The smallest amount of sick time that an employee can take is one hour. Sick time cannot be used as an excuse to be late for work without notice of an authorized purpose. If an employee's absence from work requires Seven Hills to call in a replacement worker to cover the absent employee's job functions, we may require the absent employee to use an equal number of hours of sick time as were worked by the replacement.

**Employees in their orientation period will begin to accrue sick time on their first day of work but may not begin to use any accrued earned sick time until ninety (90) calendar days after their first day of work.**

**Notice     of     Use     of     Earned Sick     Time:**   Employees must notify their supervisors, or his/her designee, before the use of earned sick time, except in an emergency. Employees must follow their program-specific notification procedures when reporting an absence.

For pre-scheduled or foreseeable use of earned sick time, employees must provide up to seven (7) days notice, except where the employee learns of the need to use earned sick time within a shorter period.

If the need for use of earned sick time is not foreseeable, then the employee must provide reasonable notice under the circumstances.

An employee who has a multi-day absence is required to provide notification of the expected duration of the leave, or if unknown, to provide daily notification to the program unless doing so would be unreasonable under the circumstances.

**Documentation:**          Written documentation from a doctor may be required prior to returning to work after an employee's use of earned sick time that:

a)   exceeds twenty-four (24) consecutively scheduled work hours;

b)   exceeds three (3) consecutive days on which the employee was scheduled to work;

c)   occurs within two (2) weeks prior to an employee's final scheduled day of work before separation of employment;

d)   occurs after four (4) unforeseeable and undocumented absences within a 3-month period; or

e)   for employees aged 17 and under, occurs after three (3) unforeseeable and undocumented absences within a  3-month period.

Written documentation may include but is not limited to written documentation signed by a health care provider indicating the need for the earned sick time or such other documentation as defined in 940 CMR 33.

In other circumstances, Seven Hills may, at its discretion, require the employee to personally verify in writing that they have used sick time for an allowable purpose.

Documentation must be submitted within seven (7) days after taking of earned sick time unless good cause is shown that additional time is required.

21

If an employee fails to comply without reasonable justification with the documentation requirements, pursuant to state regulations Seven Hills may recoup the sum paid of earned sick time from future pay, as an overpayment.

If documentation is not provided, Seven Hills may deny the future use of an equivalent number of hours of accrued earned sick time until documentation is provided.

Seven Hills may require a fitness-for-duty certification, a work release, or other documentation from a medical provider before an employee returns to work after an absence during which earned sick time is used if reasonable safety concerns exist regarding the employee's ability to perform their duties. "Reasonable safety concerns" means a reasonable belief of significant risk of harm to the employee or others.

**Maximum Accruals/Earned Sick Leave Balance:** Earned sick time for full-time (35+ hours) regular benefits eligible employees may carry over up to 48 hours of earned sick time to the next calendar year. Regular benefits eligible employees may accrue sick leave up to the following maximum accruals:

| Length of Service | Maximum Annual |
|---|---|
| 0 – 4 years | 40 days |
| 5 – 10 years | 50 days |
| 11 – 14 years | 60 days |
| 15 years and above | 90 days |

Non-benefits eligible employees may only carry over up to 40 hours of sick time into the next calendar year regardless of length of service. However, such employees may never accrue more than 40 hours of earned sick time.

Earned sick time is not payable upon separation of employment.

**Expectations Regarding Attendance:** Employees should remember that regular, reliable attendance and timeliness is expected. If an employee is repeatedly absent, late or leaves work early for reasons not covered by earned sick time or commits fraud or abuse by engaging in an activity that is not consistent with allowable purposes for sick time or exhibits a clear pattern of taking sick time on days just before or after a weekend, vacation or holiday, the employee may be subject to disciplinary action.

**Interaction with Other Types of Leave:** If any time covered under this policy is also covered under Seven Hills' FMLA, parental leave, domestic violence leave, SNLA, or other leave of absence policy, sick time shall run concurrently with such leave. Employees may choose to use, and Seven Hills may also require employees, to use earned sick time to receive pay for absences under other leave policies if those absences would otherwise be unpaid.

4. **Personal Days:** All regular full-time and specified job-classification employees shall be granted three (3) personal days on July 1st each year. Personal time for full-time employees and those in specified job classification will be granted on a pro-rated basis as follows:

| Date of Hire | Personal Days |
|---|---|

Exhibit #  8

# ISLAND COUNSELING CENTER, LLC
## 108 Grove Street, 2nd Floor
## Worcester, MA  01605
## TEL:  508-753-3220
## FAX:  508-753-3224

March 16, 2020

Attention:    Attorney Mary Yanneth Bernudez Camp
              P: 508-754-1970
              F: 978-466-8664

Reference:    Martha Rivera
              DOB: 01/27/1962

Ms. Rivera continues to be a patient in active treatment with me at Island Counseling Center. She has been under my care since 08/13/2018; she is being treated for Anxiety, Major Depressive Disorder and PTSD. She is followed by medication management with me and is prescribed Gabapentin, Minipress, Ambien, Zoloft, Lorazepam and Zyprexa.

Ms. Rivera engages in treatment and is working towards goals and is compliant with her treatment plan.

Ms. Rivera was also seen by David Cloutier, LMHC for psychotherapy services from 01/10/19 – 05/08/19, but due to insurance coverage, she was unable to continue services with him.

**Update of Condition & Symptoms:**

Ms. Rivera was seen on 3/9/2020 for medication evaluation. Emotional dysregulation persists with severe highs and lows. She continues with ongoing fatigue throughout the day, has trouble sleeping at night and when she does fall asleep she experiences trauma-related nightmares. Physiological manifestation of anxiety/stress such as headaches and neck/shoulder pain; started physical therapy for same. Impaired appetite, panic attacks occur daily, usually provoked by a stressor or a fear and feels incompetent due to impaired memory and cognition. Ms. Rivera is forgetful and unable to recall simple tasks or routines. Also endorses Hypervigilance, hyperarousal and symptoms indicative of PTSD.

She was recently prescribed Ambien to help with insomnia, and continues with other medications.  She is continuously re-assessed at her follow-up appointments, and at this time based on my clinical assessment of client, she is unable to work.


Tanille Louis
Tanille Louis, PMHNP

Exhibit #  9



*"Senderos ...For New Beginnings..."*
*Silvia Franco, MA, LMHC, CGP*
*Bilingual -Bicultural Practice*
*277 Main Street - 2nd. Floor, Suite 201*
*Marlborough, MA 01752*
*Ph# (508)397-8261 - Fax# (508)229-3377*
*senderosfornewbeginnings@yahoo.com*
*www.senderosfornewbeginnings.com*

March 18, 2020

To Whom It May Concern

I am writing this letter on behalf of my patient Ms. Martha Rivera, DOB: 01/27/1962. I have known Ms. Rivera since late April 2017. Ms. Rivera entered in treatment to process feelings and disturbing thoughts, related to being bullied, in 2014, by supervisors at her workplace. The first step in treatment was to develop a good relationship, good rapport, and establish an alliance before moving to trauma work. In September 2017, another situation took place that sent Ms. Rivera into a deep depression, with generalized anxiety, panic attacks and reactivation of post-traumatic stress disorder symptoms. Since this moment, Ms. Rivera had to go to the Emergency Room in a couple of occasions, and had urgent visits with her primary care doctor, her psychiatric nurse prescriber and the undersigned, on top of the regular visits.
Ms. Rivera has not been able to function to her potential since September 2017. She had moments of some stability; however, she has not been able to go back to the person I met in April 2017. Her symptoms have been constantly reactivated by the ongoing reviewing of testimonials and rebutting accusations. She presents depressed mood, sleep problems with disturbing nightmares, intrusive thoughts and extreme anxiety with panic attacks. She hyperventilates, presents shortness of breath, palpitations, tremors, shakes and diarrhea on top of depressed mood, nightmares, flashbacks and intrusive thoughts. She developed severe autonomic eyelid movements caused by stress, for what she has been seen by a neurologist.
Ms. Rivera has been in constant crisis as a consequence of what she experienced at her workplace and the ongoing process that has re-traumatized her over and over again.
The majority of the work done in therapy has been focused on crisis intervention, CBT, radical acceptance and mindfulness.
I sincerely hope Ms. Rivera can move from ongoing crisis to a more stable place. Ms. Rivera needs to regain hope in the future and some stability to work on improving her mood, process disturbing memories and rebuild her self-esteem.

Sincerely,

Silvia Franco, MA, LMHC , MA, LMHC

Exhibit #  10



**Nancy. D. Berube, M.D., P.C.**
**121 Lincoln Street**
**Worcester, MA 01605**

03/18/20

To Whom It May Concern

I have been the primary care provider for Martha Rivera since 2008. I have been treating her in my office from 09/02/2017 to the present, and continuing, for PTSD, Anxiety, Depression due to work related stress. Her symptoms include nightmares, insomnia, tearfulness, poor concentration, flashbacks to trauma, fatigue, muscle tics in periocular muscles, perioral muscles and right hand. These symptoms have continued to the present time and are exacerbated by situations in which she is required to concentrate on the traumatic events at her old work place.
She is not able to maintain interactions especially in stressful situations.
I am treating her with medications and she has been treated with Psychotherapy by Sylvia Franco, LMHC .
She continues to be unable to work at all at present.

Sincerely,

Nancy D. Berube MD

Exhibit #  11

# CONFLICT DISCLOSURE FORM TO BE COMPLETED BY PHYSICIAN

| | |
|---|---|
| **Judge:** | PAUL F BENOIT |
| **Employee:** | RIVERA, MARTHA |
| | LEOMINSTER, MA 01453    978-840-4328 |
| **Employee's Attorney:** | MARY Y BERMUDEZ CAMP ESQ |
| | LEOMINSTER, MA 01453    508-754-1970 |
| **Employer:** | SEVEN HILLS FOUNDATION |
| **Insurance Company:** | ARROW MUTUAL LIABILITY |
| **Insurer's Attorney:** | JOHN F KEEFE ESQ |
| **Date of Injury:** | 09/20/2017 |
| **Board Number:** | 3474517 |
| **Region of Conference:** | WORCESTER |

I.P.E. SELECTION OR SPECIALTY CODE: ZAMIR NESTLEBAUM, M.D.

BODY PART: MENTAL; PSYCHIATRIC

CHECK IF I.P.E. SELECTED BY PARTIES ☐        OR JUDGE APPOINTED ☒

SECOND I.P.E. SELECTION OR SPECIALTY CODE:

APPROVED BY JUDGE ☐              RESPONSIBLE PAYING PARTY ☐

JUDGE'S QUESTION
REASONABLE & NECESSARY ☐          LOSS OF FUNCTION ☐
TREATMENT

Impartial Physicians (IP) are required to disclose potential conflicts of interest that may result from relationships to parties involved in the workers' compensation case in which they are being asked to perform an impartial medical examination.

✓        I have no conflict-of-interest relationship with the parties.  This is also true with respect to members of my immediate family.

_____        The following potential conflict-of-interest relationship(s) are relevant:

**Name of Organization**                    **Nature of Relationship**

_____          _____

_____          _____

_____          _____

3/09/2019                         _Signature_
Date

**IF A CONFLICT EXISTS, PLEASE CALL THE SCHEDULING CLERK IN THE IMPARTIAL SCHEDULING UNIT AT 617-727-4900.**

Newton Square Health Center, P.C.
Zamir Nestelbaum, M.D.
338 Highland Street
Worcester, MA 01602

## IMPARTIAL PHYSICIAN EXAMINATION

| | |
|---|---|
| **Employee:** | **Martha Rivera** |
| **Board #:** | **34745-17** |
| **Region:** | **Worcester** |
| **Judge:** | **Paul F. Benoit** |
| **Re:** | **Impartial Physician Examination** |
| **Physician:** | **Zamir Nestelbaum, M.D.** |
| **Date:** | **03/29/2019** |
| **Location:** | **338 Highland Street, Worcester MA 01602** |

This Impartial Physician Examination is based upon a 90-minute interview in my office with Ms. Rivera and a review of the medical records listed below. Prior to proceeding with the interview, I reviewed with Ms. Rivera the limits of confidentiality of this interview. I informed Ms. Rivera that I would be preparing a report based upon the contents of the interview and a review of the medical records listed below and will be sending it to the Department of Industrial Accidents in Boston with distribution to the interested parties. Ms. Rivera indicated that she understood the limits of this confidentiality and agreed to proceed with the interview. Ms. Rivera also brought along her 21-year-old son Juan Diego, an undergraduate at Duke University, who also reviewed this with Ms. Rivera. Juan Diego sat in at Ms. Rivera's request throughout the interview and helped translate or explain certain questions to make sure Ms. Rivera understood the questions. It is my judgment that he did not interfere with the interview and was very helpful at times to clarify questions for his mother. He did not translate in the usual sense of that process. Ms. Rivera's command of English was good.

The medical records will be listed below in essentially the order that I received them. There may be duplications. The records involve approximately 1,000 pages sent to me by the interested parties. Some of the records were unintelligible but the great majority was able to be read.

1. Dr. Nancy Berube:
   (1) FMLA Physician Statement
   (2) Fitness for Duty forms
   (3) Certification of Health Provider
   (4) Letters from 02/09/18-03/12/18
   (5) Medical records 06/16/14-05/08/17, Part 1 of 2

2.

Silvia Franco, MA, LMHC:
   Records 04/29/17-06/09/18

3. Boston Sports and Shoulder Center, BSSC:
   Records 04/17/15-05/30/18

4. Patrick Hogan, M.D.:
   Records 06/27/16-05/31/19

5. Tanille Louis, PMHNP:
   Records 08/13/18-11/28/18

6. Nancy Berube, M.D.:
   Records 08/23/18-09/25/18

7. Nancy Berube, M.D.:
   Records from 06/16/14-09/25/18

8. Nancy Berube, M.D.:
   Medical records from 10/25/18-01/03/19

9. Dr. Jonathan Tisdell:
   Medical record 12/2018

10. Tanille Louis, PMHNP:
    Medical records from 11/28/18-01/04/19

11. Silvia Franco, MA, LMHC:
    Medical records from 11/21/18-01/05/19

12. St. Vincent Medical Center:
    ER records 12/21/18

13. David S. Kroll, M.D.:
    Independent Medical Examination, 11/27/18

14. Nancy Berube, M.D.:
    Medical records from 02/04/13-04/24/18

15. St. Vincent Hospital:
    Medical records from 07/23/13-02/07/18

16. Reliance Medical Group:
    Medical records from 01/03/17-05/21/18

Martha Rivera
March 29, 2019
Page 2


17. St. Vincent Hospital ER records

18. Patrick Hogan, M.D., medical records

19. Charanjit Singh Raos letter to Dr. Berube

20. Dr. Jonathan Tisdell, medical records from 09/10/18-10/17/18

21. Tanille Louis, PMHNP:
    Medical records from 08/13/18-11/13/18

## IDENTIFYING DATA:

Ms. Rivera, date of birth 01/27/1962 is a 57-year-old married woman living with her husband and two adult sons. As noted before, her son Juan Diego is 21 years old and is an undergraduate at Duke University. She also has a 24-year-old son, Rodrigo, who is in the U.S. Marine Corp and is currently stationed in Israel. Ms. Rivera is currently not working but considers herself an active employee at Seven Hills Foundation in Worcester. Ms. Rivera worked for the Seven Hills Foundation for 14 years from 2004 until her last day of work, which was 09/20/17. At that point, she left. She had a number of physicians during the years she worked for Seven Hills, approximately seven physicians. Her most recent job title was Program Manager of the Community Based Day Support Program, CBDS. This was a program for young adults with autism over the age of 22. The mission of the program was to help the clients find jobs, develop independent living skills. Some lived with families, some with group homes, some had guardians, and some had their own guardians. She was in that job from 09/12/16 through 09/20/17. Ms. Rivera had other jobs including her first job as an Activity Specialist through Area Director of Residence Homes. As the Area Director, she controlled 10 houses with 35 residents from DDS and included home care programs with 10 different affiliate programs and Clinical Associates. Ms. Rivera reports that she was demoted in July 2014. She reports learning in May 2014 that a program that she was supervisor for, Clinical Associates, was closing. She found out at the same time as the employees and the clients. She reports that her employees were upset that she did not tell them. She presided over 35 clients that she worked with for eight years. She reports helping them develop and grow up. She notes that she worried that it was her fault that the program was closed, that she had failed to protect the clients. She was not able to adequately able to explain the closing of this program to the clients, so witnessed them suffering with this news. She states she did not want to go, that she took it quite personally, that the "kids were the same age as my kids". Ms. Rivera reports that she was really committed to her work and committed to the clients and worked hard to stabilize their behavior. She was aggrieved that she was not told that the program was going to be closed ahead of time and before others. The clients were to be placed within three months across other programs. The majority will transfer to

Martha Rivera
March 29, 2019
Page 2

the Devereux School, which had rented space from the Seven Hills Foundation. Ms. Rivera was informed that she was to be demoted, that her position would be shifted. However, her pay would remain the same and also the same responsibility as prior administrators in the position she was to be transferred to. Ms. Rivera reports that Human Resources wanted to reduce her salary and increase responsibility and was told that she would have a choice either to go to the Devereux School or to another job within Seven Hills. She reports that the Devereux School wanted her but the job went to a different individual and so she did not get that. She believes that this was done to hurt her. However, she finished the job in closing the program but reports that she found herself in limbo, no position at Devereux, and no position at Seven Hills. She states that she felt "betrayed". Ms. Rivera reports that she was passionate about her work, that she enjoyed it, and that she got excellent feedback for her work. She states she was the Employee of the Year in 2013 and the Employee of the Quarter twice in 2015. She was also asked to be part of a promotional video for the Seven Hills Foundation that year. Ms. Rivera reports that she called frequently to find out what her next job was and was transferred to a new program for Acquired Brain Injury, ABI. This was for reduced salary. She reports that she threw herself into her work as director of the program. She got Quest Licensure from the government in order to open the program, which opened in August 2014.

Ms. Rivera reports that in June 2014, she began to feel increasingly depressed, "devastated", felt "horrible". She states she was heartbroken and nobody would listen to her and no one communicated to her from the foundation. She felt "annoyed". She began seeing her primary care physician Dr. Nancy Berube for anxiety and depression and was prescribed Citalopram. She reports insomnia, decreased appetite with a 30-pound weight loss through 2015. She reports crying all the time, feeling helpless and hopeless and without a future. She reported feeling that she had suffered a big loss. Her concentration was poor, she reports feeling tired with poor energy, anhedonia. She isolated herself from her friends. She reports that she was not caring for herself, that she was not functioning. She denies suicidal ideation, homicidal ideation. She denied suicidal behavior or self-injurious behavior. She also described feeling very anxious with full-blown panic attacks at least twice a month. These involved panic anxiety, shortness of breath, feeling "paralyzed", nausea and vomiting. These lasted minutes to half an hour. They were associated with thoughts of what had happened to her, she described nightmares throughout 2014 and going forward based upon this event and how she was treated by supervisors at the program described below. Ms. Rivera reports that she continues to have panic attacks to the present day, that they are worse in intensity and more frequent.

Ms. Rivera reports a series of experiences described as being poorly treated by supervisors and managers. When she was transferred to the new program, her manager, Lisa Sullivan, would frequently humiliate her in front of others and make fun of her accent in meetings. Ms. Rivera reports she had difficulty pronouncing the word focus and that Ms. Sullivan made fun of that and tried to ask her to say that frequently.

Martha Rivera
March 29, 2019
Page 2

She was particularly hurt by feeling humiliated in front of the people that she worked with, people that she hired. Ms. Sullivan would "shush me" in meetings, would rip up her papers in front of others. She felt abused. She complained to other supervisors such as Sharon Goldberg but nothing happened and the treatment never stopped. She states she was the only one that was mistreated. She was particularly annoyed that her complaints were never acknowledged such as mold in a bathroom that had been flooded. Ms. Rivera reports that she reported this to Sharon Goldberg's boss, a Vice President named Richard Nickles; however, she did not get support from him. At one point, she was accused of being an alcoholic, of giving alcohol to the residents. Ms. Rivera reports that for two years, she was abused frequently by her supervisors until there was a meeting on 06/13/16 with her coworkers and supervisors. Ms. Rivera reports that her coworkers threatened to quit at that meeting because of how Ms. Rivera was being treated by Lisa Sullivan. She reports that Human Resources finally investigated the situation and fired Ms. Sullivan. On 07/12/16, Sharon Goldberg told Ms. Rivera that Lisa was leaving because of what had happened to her. Moreover, Ms. Goldberg apologized in front of the Vice President of Human Resources to Ms. Rivera. Ms. Rivera was upset that she had suffered loss of reputation, disrespect, and that Sharon Goldberg pretended not to be a part of the problem. In fact, Ms. Rivera reports that Ms. Goldberg continued to disrespect her, yelling at her in front of Human Resources, Marilyn Flores. Ms. Rivera reports that "Sharon yelled at me, disrespected me, left, and slammed the door". Ms. Flores reports that this was too much for her and states she was told by Human Resources to take a vacation and they would find her another job. She left on vacation in August 2016 and her former supervisor at Seven Hills, Phil Philbin brought her to a different position within Seven Hills. She began the new job in March 2017. Ms. Rivera reports that she had some problems with Mr. Philbin in terms of harassment. She states she was not hurt by him, that he was treating her poorly. She recalls telling him to stop. Ms. Rivera reports that Phil would laugh at her at times, ridicule her, and make fun of her. However, Phil Philbin died suddenly in July 2017 which was shocking to Ms. Rivera and she did grieve his loss as she had a relation to him in the past at work.

Ms. Rivera had surgery on 09/06/17 for a Panniculectomy on 09/06/17. She was supposed to come back on 09/18/17 but in fact came back on 09/12/17. She found that people broke the drawers to her desk and keys were used to open locked files and that papers were missing. She states she did not know why this happened and felt disrespected. She felt uncomfortable and disrespected by Phil Philbin's boss. On 09/12/17 when she returned, she was told there would be a meeting on 09/13/17. She was accused by her supervisor at that point of not doing her work, and accused of things in front of her coworkers. Ms. Rivera reports feeling betrayed, could not understand why these accusations were made, and felt "broken" on the inside. She states. She states again that they made fun of how she spoke, and decided that "I can't be here anymore". She reports that the new supervisor gave her policies involving disciplinary actions against her. She states she had no meetings prior to these disciplinary actions which were done without warning. She felt that they were trying to

fire her without due process.  On 09/19/17, in another meeting, she heard the same information and states that she broke down when she heard that there was a plan to replace her without a reason given and without a process.

Ms. Rivera reports that Dr. Berube, her primary care physician, began treating her for her psychiatric condition in 2014 when she was complaining of significant anxiety and insomnia.  Dr. Berube managed her psychiatric treatment from 2014 to 2018 prescribing Citalopram, Lorazepam, gabapentin, and bupropion.  Because Ms. Rivera was increasingly symptomatic, she was referred for psychiatric treatment at the Island Counseling Center to Nurse Practitioner Tanille Louis.  Mr. Louis started Sertraline and increased up to 200 mg per day.

Ms. Rivera reports frequent nightmares of being humiliated in meetings over the years.  She reports ongoing insomnia, sleeping 3-4 hours per night with difficulty falling asleep and middle insomnia.  She reports ongoing fatigue, poor energy, anhedonia, poor concentration, and easy distractibility.  She reports no confidence in being able to do complex work.  She has little confidence driving.  Recently, when she drove her car, she hit the side mirror on a mailbox.  Ms. Rivera reports being socially isolated, rarely goes out of the house.  She reports passive suicidal ideation.  She reports passive suicidal ideation that she could go to sleep and not wake up.  She denies active suicidal ideation, denies suicidal behavior or self-injurious behavior.  She reports being increasingly hopeless and helpless and feeling as bad as she ever has.  She reports crying frequently for no apparent reason.  Ms. Rivera reports having full-blown panic attacks 2-3 times per week.  She also reports new onset of facial tic when she gets very anxious.

## CURRENT MEDICATION:

Ms. Rivera brought in a current list of her medications.  These include:
1.  Metformin, 1500 mg per day in divided doses.
2.  Levothyroxine 88 mcg per day.
3.  Omeprazole 20 mg per day.
4.  Spironolactone 100 mg per day.
5.  Gabapentin 300 mg b.i.d.
6.  Lorazepam 0.5 mg daily p.r.n.
7.  Rexulti 2 mg daily.
8.  Sertraline 200 mg daily.
9.  Mirtazapine 30 mg q h.s.
10. Prazosin 3 mg q h.s.
11. Fish oil.
12. Docusate sodium.
13. Multivitamin.

**ALLERGIES:**

No known drug allergies.

**MEDICAL HISTORY:**

1.  Hypothyroid disorder.
2.  Diabetes mellitus type 2.
3.  Hypertension.
4.  Tic disorder.
5.  Right carpal tunnel syndrome.
6.  Gastroesophageal reflux disorder.
7.  Osteoarthritis of knees bilaterally.
8.  Right knee surgery May 2017.
9.  Right knee surgery August 2015.
10. Status post Panniculectomy February 2018.
11. Status post breast reduction surgery.
12. Chronic back pain.
13. Status post cholecystectomy.
14. Alcohol and substance abuse history.  Ms. Rivera denies any history of alcohol or substance abuse.

**FAMILY HISTORY:**

Ms. Rivera reports her sister has a history of suicidal behavior at age 15 or 16.  Father has a history of alcohol dependence.

**SOCIAL HISTORY:**

Ms. Rivera reports she was born and raised in Columbia.  She was an engineer in Columbia and worked for a University.  However, she emigrated to the U.S. in 2001. She had been married in Columbia but her first husband died in a plane crash and she married a friend of her husband's and has been married for 25 years.  She described this as a good marriage and that he has been very supportive though they had some difficulty during the last several years when she was increasingly symptomatic.  As stated, she has two sons who are doing well, one in college and one who is a U.S. Marine.  In regards to the future, she states, "I don't know".  She states that she wanted to be as successful as she has been in the past that she would like to return to work when she feels better and more confident.  She states that she is not able to work in any capacity now, stating that "I'm clumsy, distracted, and can't function well". Currently, she volunteers by helping a couple from Columbia who have a quadriplegic and blind son, age 38.  She helps them take care of him.  He has a feeding tube and she helps feed him, shower him, and arrange for his medication.

Martha Rivera
March 29, 2019
Page 2

## MENTAL STATUS EXAMINATION:

Ms. Rivera is a well-kempt, cooperative woman with good eye contact appearing somewhat older than her stated age. Psychomotor activity is somewhat fidgety and mildly hyperkinetic. Her mood is sad and depressed. She cries easily throughout the session. Her affect is labile. Her thoughts are circumstantial and occasionally tangential. However, she mostly is able to get back to coherent history despite rambling at times. She denies auditory or visual hallucinations, and denies paranoid ideation and no delusions are evident or reported. Ms. Rivera reports passive suicidal ideation such as "I'd like to go to sleep and not wake up". She denies any active suicidal thoughts, denies any plans or intent to harm herself. She denies self-injurious behavior. Ms. Rivera has a good fund of knowledge. Her language skills are fair though this may have been affected by anxiety discussing what was for her difficult in her life. As stated above, her son accompanied her and was able to clarify some things she was trying to say and was able to prompt her at times. He did not translate any of the history and she found his presence helpful.

Ms. Rivera is alert and oriented x3. She can recall presidents from Trump back to Clinton. She can spell W-O-R-L-D forwards and backwards. She could do simple arithmetic problems, serial 7's are intact. Simple proverbs are able to be abstracted. She recalls 2 out of 3 objects after 5 minutes. Her insight is good and judgment is good.

## REVIEW OF RECORDS:

### NANCY BERUBE, M.D.:

As noted above, Ms. Rivera has been seeing Dr. Berube for primary care for many years. Dr. Berube was the primary psychiatric prescriber up until her referral to psychiatric Nurse Practitioner Mr. Louis in 2018. Ms. Rivera was diagnosed by Dr. Berube as having anxiety disorder with debilitating panic attacks and major depressive disorder, recurrent moderate to severe. Dr. Berube diagnosed Ms. Rivera as having some symptoms of post-traumatic stress disorder including recurrent and distressing dreams, sleep disturbance and concentration problems. Dr. Berube opined that Ms. Rivera has been the subject of emotional abuse at the workplace which has undermined her self-worth and self-esteem and the symptoms she presents do not allow her to concentrate, or feel at ease in any work environment. Dr. Berube had prescribed a number of psychotropic medications including topiramate 100 mg twice a day, Phentermine 37.5 mg daily, bupropion 75 mg daily, lorazepam 37.5 mg b.i.d. p.r.n. In addition, Ms. Rivera was also prescribed alprazolam 0.5 mg q.h.s. by Dr. Hogan, her OB-GYN physician. Dr. Berube also prescribed Citalopram for many years up to 30 mg per day. Dr. Berube filled out several physician statements for FMLA noting that Ms. Rivera was not able to work with any assignment requiring concentration and close attention, unable to interact with known previous management or work in previous location where hospital environment occurred. Dr. Berube noted inability to

concentrate, poor attention to details and unable to make decisions, to drive or other day-to-day activities. This was signed on 01/02/18. A PHQ-9 dated 03/16/16 was 14.

## TANILLE LOUIS, PMHNP:

Mr. Louis evaluated Ms. Rivera initially on 08/13/18 on referral from Dr. Berube. She was diagnosed with major depressive disorder, recurrent moderate and post-traumatic stress disorder. Mr. Louis noted that she witnessed domestic violence in the home and father was an alcoholic. Mr. Louis discontinued bupropion 75 mg and added Rexulti 0.5 mg, and prazosin 1 mg q h.s. He continued Citalopram 30 mg per day initially. Eventually, Citalopram was tapered and discontinued and Sertraline was initiated and increased up to 200 mg per day. He noted that Ms. Rivera continued to complain of nightmares thought that improved with the addition of Prazosin. Mr. Louis referred Ms. Rivera for consultation for transmagnetic stimulation which is also performed at Island Counseling. To date, she has not had that treatment. On 11/28/18, Mr. Louis continued to diagnose major depressive disorder and posttraumatic stress disorder. Mr. Louis noted that Ms. Rivera's functioning has been negatively affected which has validated her inability to resume work at this time. He noted that the symptoms make it more difficult to manage work-related tasks effectively and in a timely manner and her difficulty with concentration and memory will also affect quality of work performed and emotional distress will disrupt work relationships if she were to return to work at this time. Mr. Louis noted that with consistent counseling and medication management, Ms. Rivera's condition is expected to improve over time.

## RECORDS OF SILVIA FRANCO, MA, LMHC:

As noted above, Ms. Franco treated Ms. Rivera in psychotherapy from 04/29/17 to the present time. Ms. Franco noted an extensive social history. She reports that Martha has a degree in engineering from Columbia. Her first husband died in a commercial plane crash three months after her marriage and then she remarried years later her first husband's best friend. Ms. Rivera graduated as an engineer and was very successful and eventually became the Dean at the St. Thomas Aquino University at a young age. Ms. Rivera was described as having a still difficult relationship with her mother. Father was an alcoholic and very abusive and dominant and may have had mental health issues. Her parents were divorced when she was 19. Father was violent with mother and Martha was the buffer. During the last conflict, she suffered some injuries in her face and her mother decided that was it. Martha threatened to leave the house and call the police. Martha's younger siblings were upset with her, as was her father. Eventually parents separated and divorced. Father was abusive mainly with mother but Martha suffered most of the aggression because she would always defend her mother. Her siblings were always scared of her father. Martha described her childhood as privileged growing up in a nice neighborhood. Martha's father died in 2014. Martha took care of him for the last few months of his life during which he apologized to her.

Martha described being persecuted in Columbia by the drug cartels. She described being kidnapped twice and threatened with her life. It was as a result of that direct violence that she made a decision to seek asylum in the United States. Ms. Franco reports that Martha sought therapy after the death of her first husband but was not helped by that. Also described was a period of depression after her first husband died. There was no treatment or medication reported. Ms. Franco diagnosed Ms. Rivera initially with major depressive disorder, with current episode moderate, and adjustment disorder with mixed anxiety and depression. By 06/09/18, Ms. Franco diagnosed Ms. Rivera with major depressive disorder, recurrent, moderate, generalized anxiety disorder with panic attacks and post-traumatic stress disorder, unspecified. Ms. Franco described Ms. Rivera's difficulties at work experiencing lack of respect by her immediate boss from the beginning. This referred to Lisa Sullivan. Ms. Franco reports that on 06/13/16, Ms. Rivera was accused of giving liquor to the residents and going to work with weapons. At that point, Ms. Rivera was described as devastated and fell into a deep depression. Ms. Rivera became distrustful of her supervisors. Ms. Rivera was described as having bad memories and intrusive thoughts related to the last weeks of her employment at Seven Hills. Ms. Rivera felt this experience had changed her somehow. She noted that her son, who had not seen her in two years because he was out of the country, noted that she is not the same person.

<u>MEDICAL RECORDS OF DAVID S. KROLL, M.D.:</u>

Dr. Kroll evaluated Ms. Rivera on 11/27/18. He notes that Ms. Rivera claimed exposure to bullying abuse and discrimination beginning in 2014 and ending when she left her job in September 2017. She claimed that exposure to this harassment caused her to develop major depressive disorder, anxiety disorder, post-traumatic stress disorder and that these conditions have caused her ongoing work disability. Dr. Kroll noted in Social History that Ms. Rivera claimed she sustained physical injuries from her father's abuse, that he drank excessively, and likely had marital infidelity. Dr. Kroll noted that Ms. Rivera told him that her father did not cause physical violence. Dr. Kroll reviewed Ms. Rivera's marriage at age 27 followed by her husband's untimely death. He described Ms. Rivera's history of several dangerous encounters with gorillas, that she was targeted by gorillas because of her businesses' government contracts and received threatening letters in the mail from them. She described being assaulted by a man driving a car and accused her of smashing into him. These three men carrying guns approached her and she was able to drive away quickly. She also drove through a checkpoint of gorillas at another point and men shot at her car as she drove away. Dr. Kroll described Ms. Rivera's history of several more incidents in which she was in grave danger in relation to gorillas and that she successfully sought asylum in the U.S. in 2001 because of these incidents. Dr. Kroll reviews the multiple incidents of Ms. Rivera's claims that she was humiliated and verbally abused by her supervisors including Lisa Sullivan, Sharon Goldberg, Phil Philbin, and others. He described Ms. Rivera's multiple incidents of feeling disrespected by her employers, her fears that she would lose her job. He describes Ms. Rivera's report of experiencing nightmares and depression. Dr.

Martha Rivera
March 29, 2019
Page 2

Kroll notes that Ms. Rivera first sought treatment for depression and anxiety in the U.S. in 2014 correlating with the time she was being supervised by Lisa Sullivan. He notes that her medical records with Dr. Berube describe depressed mood and initiation of Citalopram. Dr. Kroll describes her more recent symptoms of feeling pervasively depressed after September 2017 that her heart was broken, that she rarely leaves her home. Dr. Kroll described Ms. Rivera as experiencing frequent nightmares including re-experiencing the meeting of 09/19/17. He notes Ms. Rivera denies flashbacks to prior traumatic incidents during the day but reports panic attacks characterized by shortness of breath, chest pain, nausea and sometimes with vomiting whenever she encounters someone she knew from work with Seven Hills Foundation. She denies hypervigilance. Dr. Kroll describes inconsistent documentation of mood and anxiety by Dr. Berube between 2013 and 2018.

Dr. Kroll administered psychological testing, MMPI-2-RF on 11/20/18. He noted that the testing he administered was notable for symptom exaggeration related to both somatic and cognitive complaints and strongly associated with non-credible memory complaints. Dr. Kroll noted that Ms. Rivera's response profile for the MMPI-2-RF was consistent with malingering cognitive symptoms, somatoform disorders, depression related disorders, anxiety disorders, including PTSD. Dr. Kroll diagnosed Ms. Rivera with major depressive disorder recurrent without psychotic features. He noted that a separate diagnosis of anxiety disorder independent from depressive disorder was not applicable. He also noted Ms. Rivera had a diagnosis of adjustment disorder with grief as a result of her loss of job at Seven Hills Foundation. He noted that Ms. Rivera did not have PTSD and she did not have an incident or series of incidents that posed a threat of physical integrity. He noted that the incidents that occurred at the workplace including September 2017 did not meet this criteria. He noted that an adjustment disorder does not cause a disability. He noted that the occurrence of major depressive disorder is multifactorial and that it would be impossible to identify a single predominant cause of Ms. Rivera's major depressive disorder including work stress. He noted that Ms. Rivera did not present evidence of psychiatric disease or disability prior to her employment with Seven Hills Foundation. He noted that because no pre-existing psychiatric disease or disability can be considered as a predominant cause of her present disability and need for treatment. Dr. Kroll opined that Ms. Rivera should return to work as quickly as possible to avoid further regression toward invalidism. He recommended vocational rehabilitation program as an interim step to returning to work.

Martha Rivera
March 29, 2019
Page 2

## DIAGNOSES:

1. Major depressive disorder, recurrent, moderate to severe without psychosis.
2. Rule out posttraumatic stress disorder.
3. Panic disorder with agoraphobia.
4. Generalized anxiety disorder.
5. Hypothyroid disorder.
6. Diabetes mellitus type 2.
7. Gastroesophageal reflux disorder.
8. Hypertension.

## IMPRESSION:

Ms. Rivera meets criteria for major depressive disorder, recurrent, without psychosis. Since 2014, she has had some waxing and waning of her symptoms of major depression and likely has had recurrence of this disorder. It is also quite likely that she had episodes of major depressive disorder in the past before she emigrated to the United States. Her first husband died suddenly in a plane crash shortly after their marriage. In addition, she was a victim of harassment and violent threats by the Columbia drug cartel, according to her history noted in multiple medical records. As a result of being shot at by gorillas and attacked physically by them and threatened with kidnapping several times, she sought and received political asylum to the United States. There were notations of depression, anxiety, nightmares, and flashbacks of these events. One can state without reservation that Ms. Rivera was exposed to dangerous and potentially fatal events that would clearly meet criteria for PTSD. Ms. Rivera is generally a poor historian but it seems quite likely that she had symptoms of PTSD in Columbia as a result of this history. She had numerous elements of PTSD over the years including nightmares and flashbacks including intrusive thoughts of violence. She has social isolation, chronic anxiety, and worsening of symptoms as she continues to be isolated at home. If Ms. Rivera does not have PTSD, then she would meet criteria for panic disorder with agoraphobia. However, given her history, the more logical diagnosis would be post-traumatic stress disorder rather than a panic disorder with agoraphobia which overlaps numerous symptoms. Ms. Rivera also would meet criteria for generalized anxiety disorder thought this could be better subsumed under a PTSD diagnosis. It is likely that her trauma in Columbia as a result of being in physical danger by gorillas which caused her to seek political asylum, was an initial episode of PTSD that was exacerbated with the workplace emotional abuse described in numerous records. It is quite common for PTSD to recur years later with much less traumatic stimulation. This is often the case where a relatively minor event later in life triggers a full re-experience of the original trauma and I believe this is what happened here. As a result, though it is to some degree by inference, there is enough data in the history that she provided to me, to Dr. Kroll, to Ms. Franco and others that the workplace emotional abuse Ms. Rivera suffered was enough to exacerbate a pre-existing condition. It should be noted in the 1,000 pages of medical records provided to me that disputed Ms.

Martha Rivera
March 29, 2019
Page 2

Rivera's description of emotional abuse at the workplace. There was no reports that this was not factual. The only argument against that was Dr. Kroll's attempt at psychological testing which described the possibility of malingering. However, given the lack of more information on how Dr. Kroll performs psychological testing as psychiatrist, I would consider his psychological testing as merely speculative.

It is my medical opinion that Ms. Rivera is totally disabled from any competitive employment at this point that she is qualified for by reason of training or experience. She is unable to concentrate, focus, or work with others. She is unable to be a supervisor or be supervised and unable to work with the public.

It is my medical opinion that the predominant cause of her psychiatric disability is the workplace emotional abuse that she experienced in multiple interactions with supervisors between 2014 and 2017. As noted above, Ms. Rivera's diagnosis of major depressive disorder is sufficient to cause her total disability. There is no other source of stress during this period that could be considered causal other than the workplace emotional abuse over the years. It is also quite likely that this emotional abuse exacerbated a prior history of post-traumatic stress disorder which combined with her major depressive disorder to further cause her psychiatric disability.

It is my medical opinion that Ms. Rivera is likely at a medical endpoint regarding her psychiatric disability. It should be noted that Ms. Rivera's psychiatric condition was inadequately treated by Dr. Berube. Virtually all of the psychotropic medications prescribed by Dr. Berube were subtherapeutic, some of them markedly so. Citalopram and bupropion and even Lorazepam doses were quite low. Although Dr. Berube saw Ms. Rivera every 1-2 weeks, there were rarely changes in her psychotropic regimen. Following referral to a psychiatric nurse practitioner, her psychiatric treatment became more aggressive with fully therapeutic doses of several anti-depressants including Sertraline and mirtazapine. However, these were not sufficient to improve her psychiatric condition. There are other psychotropic medications that may improve her clinical condition but given the time that has passed since 2014, it is unlikely that there would be a major change at this point sufficient to return Ms. Rivera to competitive employment. She is volunteering to help a family take care of a disabled young adult but this does not have the same pressures or work conditions as competitive employment and I would not regard this as evidence that she can return to work imminently.

Sincerely,

Zamir Nestelbaum, M.D.
Diplomate American Board of Psychiatry and Neurology, Inc.
ZN:sk   D: 02/02/20 VF #00/97&98

**Employee Name:** **MARTHA RIVERA #3474517**

*Instructions to Impartial Examiner:* Please answer the following questions to a ***reasonable degree of medical certainty:***

### Section 1(7A) – Emotional / Mental Disability.

1. Did the employee have an emotional/mental condition that caused him/her to be disabled? _____✓_____ Yes        _____ No

2. *If your answer to #1 is "yes"*, did the emotional or mental disability have as its predominant contributing cause an event or series of events occurring within the employment? _____✓_____ Yes        _____ No

3. (a) *If your answer to #2 is "yes"*, on what date did the alleged event or series of events occurring within the employment **first become a predominant cause** of disability?

   Date: _____2014_____

   (b) *If your answer to #2 is "yes"*, does the alleged event or series of events occurring within the employment **remain a predominant cause** of disability or need for treatment? _____✓_____ Yes        _____ No

4. *If your answer to #3(b) is "no"*, please state the date on which the alleged event or series of events occurring within the employment **ceased to be a predominant cause** of disability or need for treatment.

   Date: _____

   ***"My signature below indicates that I am stating these opinions to a reasonable degree of medical certainty."***

**Signature of Physician:** _____

**Date Signed:** _____3/29/2019_____

Exhibit #  12

**Martha  Rivera**

| | | |
|---|---|---|
| Company | Period Begin | Division |
| 1894 | 9/2/2017 | |
| Number | Period End | Branch |
| 757389 | 9/15/2017 | 01 |
| Social Security # | Check Date | Department |
| | 9/21/2017 | 011113 |
| Hire Date | Check Number | Team |
| 9/12/2016 | -98537834 | |

## Seven Hills Foundation

81 Hope Ave
Worcester, MA 01603 508-983-2909

Per =0.00 HOURS
Sick =13.0721 HOURS
SickBank =0.00 HOURS

## Earnings

| Description | Location / Job | Rate | Hours | Current | Year To Date |
|---|---|---|---|---|---|
| Regular | | 21.16 | 40.00 | 846.40 | 22085.73 |
| Vacation | | 21.16 | 8.00 | 169.28 | 2866.67 |
| Sick | | 0.00 | | | 422.17 |
| Personal | | 21.16 | 24.00 | 507.84 | 507.84 |
| Holiday | | 21.16 | 8.00 | 169.28 | 1340.24 |
| LOA Sick Bank | | 0.00 | | | 125.46 |
| Leave Sick | | 0.00 | | | 41.82 |
| Leave Vacation | | 0.00 | | | 501.84 |
| Sick Bank | | 0.00 | | | 351.50 |
| Travel Reimburseme | | 0.00 | | | 252.80 |
| MEMOS | | 0.00 | | | |
| ER N.E. Family Por | | 0.00 | 0.00 | 596.36 | 11114.76 |

## Deductions

| Description | Current | Year To Date |
|---|---|---|
| Fed (M/0) (1350.20) | 116.76 | 1788.13 |
| OASDI (1350.20) | 83.71 | 1353.40 |
| Medicare (1350.20) | 19.58 | 316.54 |
| MA (0/0) (1350.20) | 63.59 | 1028.14 |
| Net Checking 1279XXXX | 1011.57 | 16633.97 |
| Accident | 8.77 | 149.09 |
| Blue Cross Dental Family | 58.32 | 1049.76 |
| Cancer Security | 12.30 | 209.10 |
| Disability | 33.92 | 604.06 |
| FSA | 76.92 | 1461.48 |
| N.E. Options Deductible I | 207.36 | 3902.40 |

| | | | Hours | Current | Year To Date | | Current | Year To Date |
|---|---|---|---|---|---|---|---|---|
| **Total Earnings** | | | 80.00 | 1692.80 | 28496.07 | **Total Deductions** | 1692.80 | 28496.07 |
| **NET PAY** | | 1011.57 | **Total Direct Deposits** | | 1011.57 | **Check Amount** | 0.00 | 0.00 |



Exhibit #  13

# ISLAND COUNSELING CENTER, LLC
## 108 Grove Street, 2nd Floor
## Worcester, MA  01605
## TEL:  508-753-3220
## FAX:  508-753-3224

September 21, 2020


Attention:     Attorney Mary Yanneth Bernudez Camp
P:  508-754-1970
F:  978-466-8664

Reference:     Martha Rivera
DOB:  01/27/1962

Ms. Rivera continues to be a patient in active treatment with me at Island Counseling Center. She has been under my care since 08/13/2018; she is being treated for Anxiety, Major Depressive Disorder and PTSD. Her diagnosis is largely related to the stress/events that Ms. Rivera had in her work. She is followed by medication management with me and is prescribed Gabapentin, Minipress, Ambien, Zoloft, Lorazepam and Zyprexa.

Ms. Rivera engages in treatment and is working towards goals and is compliant with her treatment plan.

Ms. Rivera was also seen by David Cloutier, LMHC for psychotherapy services from 01/10/19 – 05/08/19, but due to insurance coverage, she was unable to continue services with him.

**Update of Condition & Symptoms:**

Ms. Rivera was seen on 9/18/2020 for medication evaluation. Emotional dysregulation persists with severe highs and lows. She continues with ongoing fatigue throughout the day, has trouble sleeping at night and when she does fall asleep she experiences trauma-related nightmares. Physiological manifestation of anxiety/stress such as headaches and neck/shoulder pain; started physical therapy for same. Impaired appetite, panic attacks occur daily, usually provoked by a stressor or a fear and feels incompetent due to impaired memory and cognition. Ms. Rivera is forgetful and unable to recall simple tasks or routines. Also endorses Hypervigilance, hyperarousal and symptoms indicative of PTSD.

She was recently prescribed Ambien to help with insomnia, and continues with other medications.  She is continuously re-assessed at her follow-up appointments, and at this time based on my clinical assessment of client, she is unable to work.


Tanille Louis, PMHNP

Exhibit #  14



*"Senderos...For New Beginnings..."*
*Silvia Franco, MA, LMHC, CGP*
*Bilingual -Bicultural Practice*
*277 Main Street - 2ⁿᵈ. Floor, Suite 201*
*Marlborough, MA 01752*
*Ph# (508)397-8261 - Fax# (508)229-3377*
*senderosfornewbeginnings@yahoo.com*
*www.senderosfornewbeginnings.com*

September 25, 2020

To Whom It May Concern:

I am writing this letter on behalf of my patient Ms. Martha Rivera, DOB: 01/27/1962. I have known Ms. Rivera since late April 2017. Ms. Rivera entered in treatment to process feelings and disturbing thoughts, related to being bullied, in 2014, by supervisors at her workplace. The first step in treatment was to develop a good relationship, good rapport, and establish an alliance before moving to trauma work. In September 2017, another situation took place that sent Ms. Rivera into a deep depression, with generalized anxiety, panic attacks and reactivation of post-traumatic stress disorder symptoms. Since this moment, Ms. Rivera had to go to the Emergency Room in a couple of occasions, and had urgent visits with her primary care doctor, her psychiatric nurse prescriber and the undersigned, on top of the regular visits.
Ms. Rivera has not been able to function to her potential since September 2017. She had moments of some stability; however, she has not been able to go back to the person I met in April 2017. Her symptoms have been constantly reactivated by the ongoing reviewing of testimonials and rebutting accusations. She presents depressed mood, sleep problems with disturbing nightmares, intrusive thoughts and extreme anxiety with panic attacks. She hyperventilates, presents shortness of breath, palpitations, tremors, shakes and diarrhea on top of depressed mood, nightmares , flashbacks and intrusive thoughts. She developed severe autonomic eyelid movements caused by stress, for what she has been seen by a neurologist. Ms. Rivera has been in constant crisis as a consequence of what she experienced at her workplace and the ongoing process that has re traumatized her over and over again.
The majority of the work done in therapy has been focused on crisis intervention, CBT, radical acceptance and mindfulness.
Based on my assessments in therapy sessions, it is my opinion, that Ms. Rivera is not ready to hold a competitive job at this time. The symptoms of PTSD, depression and anxiety interfere with her ability to function in a competitive work environment.
I sincerely hope Ms. Rivera can move from ongoing crisis to a more stable place. Ms. Rivera needs to regain hope in the future and some stability to work on improving her mood, process disturbing memories and rebuild her self-esteem.

Sincerely,

Silvia Franco, MA, LMHC

Exhibit #  15



**Nancy D. Berube, M.D., P.C.**
121 Lincoln Street
Worcester, MA 01605
(P) 508-756-0514 (F) 508-756-0843

09/21/20

To whom it may concern

I have been the primary care provider for Martha Rivera since 2008. I have been treating her in my office from 09/02/2017 to the present, and continuing, for PTSD, Anxiety, Depression due to work related stress. Her symptoms include nightmares, insomnia, tearfulness, poor concentration, flashbacks to trauma, fatigue, muscle tics in periocular muscles, perioral muscles and right hand. These symptoms have continued to the present time and are exacerbated by situations in which she is required to concentrate on the traumatic events at her old work place.
 She is not able to maintain interactions especially in stressful situations. I am treating her with medications and she has been treated with Psychotherapy by Sylvia Franco, LMHC.
She continues to be unable to work at all at present.

Sincerely,

*Nancy D. Berube MD*

Exhibit #  16

**THE COMMONWEALTH OF MASSACHUSETTS**
THE COMMONWEALTH OF MASSACHUSETTS
COMMISSION AGAINST DISCRIMINATION
484 Main Street, Room 320
Worcester, MA 01608

## <u>CHARGE OF DISCRIMINATION</u>

| | |
|---|---|
| MCAD DOCKET No. | EEOC CHARGE N0. |
| ORIGINAL FILING DATE: 05/31.2018 | VIOLATION DATE: Various dates |

<u>Name of Aggrieved Person or Organization</u>

**Martha Rivera**
24 Belair Heights
Leominster, MA 01453
Primary Phone: (508) 667-6947
------------------------------------------------------------------------------------------------

<u>Named is the employer, labor organization, employment agency or state/local government agency who discriminated against me:</u>

**Seven Hills Foundation**
81 Hope Avenue
Worcester, MA 01603

**Seven Hills Foundation Affiliates:**

Seven Hills Aspire, Inc.
Seven Hills Community Service, Inc.
Seven Hills NeuroCare, Inc.
Seven Hills Clinical Associates
Seven Hills Family Service

**Number of employees:**       Over 25

**Work Location:**
22 Grant Rd.
Devens, MA 01534

<u>Named are individuals who acted as agents and/or representatives of the above named organization who also discriminated against me during my employment with Seven Hills Foundation:</u>

**Kate Cleary**
Vice President Seven Hills Clinical Associates
81 Hope Avenue
Worcester, MA 01603

**Richard Neckes**
Senior vice President Seven Hills Community Service, Inc.
81 Hope Avenue
Worcester, MA 01603

**Sharon Golberg**
Vice President Seven Hills Community Service, Inc.
81 Hope Avenue
Worcester, MA 01603

**Lisa Sullivan**
Area Director ABI
81 Hope Avenue
Worcester, MA 01603

**Joseph Realbuto**
Vice President Seven Hills Aspire, Inc.
81 Hope Avenue
Worcester, MA 01603

**Chris Snell**
Seven Hills Aspire, Inc.
Director of Clinical services

-----------------------------------------------------------------------------------------------

Cause of discrimination based on:

Race/Color: Hispanic; National Origin: Colombian; Gender: Female;   Disability;
Retaliation, Pervasive Hostile Environment and Disparate Treatment which has adversely
impacted Complainant's terms and conditions of employment; Adding and Abetting
Discrimination and Interfering with Complainant's Rights in violation of applicable
statute; abuse of power, invasion of privacy and intentional infliction of emotional
distress.

-----------------------------------------------------------------------------------------------

**The particulars are:**

I, Martha Rivera, the Complainant in this matter believe that during the course of my almost
14 years of employment with Seven Hills Foundation (hereinafter "SHF") I have been
discriminated against on a continuous basis by SHF, its agents and representatives and, in

2

particular by the individuals listed above. As a direct consequence of their discrimination on the basis of, among others my race, national origin and disability my health has been affected and I have sustained great emotional and mental distress that is not the result of mere negligence by my employer when management and staff, with management's acquiesce, willfully engaged in conduct that created a hostile workplace that adversely impacted the terms and conditions of my employment, placing me at an unreasonably high risk of emotional and mental injury they knew or should have known of.

I believe I can prove by way of oral testimony and documentary evidence the strong causal nexus between my severe work related injuries, diagnosed and treated conditions, consequential incapacity and inability to work, and the series of events that occurred at my workplace that had to do with, among others, my lack of resources (cellphone, lap top, printer, office space, etc.) being forced to use my own  and to pay for them, such as my cellphone out of my own packet; lack of training, lack of management support, lack of respect by management and staff, bulling, curtailed decision power and wrongful demotion. I am able to establish prima facie case of discrimination and to show that similarly situated, qualified persons at SHF not of my protected class were treated differently and more favorably than I was during the course of my employment.

I was diagnosed during my employment and most recently after the incidents of September last year with PTSD, Anxiety and Acute Depression due to work related stress with consequential physical ailments also described by my primary doctor in her Physician's Statements and Fitness for Duty Forms all as a consequence of the continuous severe discrimination, bullying and disparate treatment I suffered described herein.

It is my strong contention that SHF cannot proffer evidence of legitimate nondiscriminatory reasons for their actions and the actions of their agents and/or representatives who were in a position of superiority to me during the course of her employment.

I also allege that my employer, its agents and representatives didn't attempt remediation. Rather, I claim, management allowed for my disparate treatment to occur and continue despite my several complaints. Therefore, any reasons they may give would simply be a pretext. These several incidents of misconduct, abuse of power and disparate treatment have been or should have been documented on my personnel file; are not isolated in nature, and, are sufficiently severe and pervasive to have altered the terms and conditions of my employment. I believe they created an abusive work environment for me and were motivated by unlawful discriminatory animus and were not followed by their immediate and effective corrective intervention at all.

Furthermore, I believe that the named individual Defendants' conduct was sufficiently pervasive and continuous during my employment as to create a hostile environment for me; that SHF was vicariously liable for their discriminatory actions and that all were jointly and severally liable for unlawful systemic discrimination.

For the reasons stated above, I also claim to have been the victim of a hostile work environment. Even if I was not discharged, having to leave my employment as the

3

conditions under which I was expected to work were intolerable and incapacitated me, I believe that in essence I was discharged.

But for their continuous discrimination and disparate treatment that I received; the severe harassment and hostile environment created against me; the retaliation that I experienced and the intolerable working conditions that existed which I reported to my employer all of which unreasonably interfered with my work performance and caused me mental and emotional distress that finally took me out of work, I would have continued my employment at SHF until I retired.

Lastly, I believe to have been retaliated further, by my employer, by having management breaking into my work cabinet; removing my work tools and personal effects from my office; trying to force me to work despite of my medical conditions, which happened on September 19, 2017, my last day of work; limiting my access to company email during my FMLA and disability; failure to reimburse me for my work miles; producing an incomplete copy of my personnel file which is missing very relevant documents; by terminating my medical coverage and not facilitating my disability claims, and the list goes on.

My therapist and medical doctor will testify to my emotional immobility caused by the workplace discrimination I suffered during the course of my employment and the retaliation I was a victim of during and after her employment ended due to my disability.

I was demoted at least twice during my employment with SHF to not fault of my own which caused me great financial loss. My salary as Area Director under the supervision of Kate Cleary of SHCA was reduced on August 12, 2014 from $59,987.20 to $ 44,990.40 after Seven Hills Clinical Associates (SHCA) closed. Management assisted other affected staff in securing comparable positions within SHF and with Devereux, the company which took over some of SHCA programs and properties. I was on limbo until the very end. After great inquiry appealing to my financial need and my seniority, I was finally placed as Residence Director of a SHF neuro care (SHNC) facility under supervision of the Area Director Lisa Sullivan of SHNC and SHF Community Service (SHCS) and of Vice-president assistant Sharon Goldberd with a $14, 996.80 drop in salary. Then, I was further demoted when I had to leave this position being forced, due to my supervisor and manager's documented abuse, I had to accept another position of lesser pay, where the abuse continued. I became a Program Manager under the supervision of Phil Philbin and most recently, after Mr. Philbin's passing, of Vice-president ASPiRE! and Seven Hills Family Services (SHFS) Joe Realbuto on or about September 12, 2016 taking a lesser salary of $42,494.40.

I received an across the board salary increase on September 20, 2016 to $43,492.40 and to $44,012.80 on September 1, 2017. Therefore, I believe that I would have been likely to receive future wage increases should I had continued working for SHF.  In summary, my demotions costed me salary losses in excess of $48,265.74.

Furthermore, I have sustained great financial damages by being force to go on FMLA. These damages include but are not limited to lost earnings from my last day of work to date;

employment benefits such as health, dental and disability insurance benefits I have been paying premiums for; pending mileage refund as well as other out of pocket expenses exceeding  which include medications, regular and visit to the emergency room copayments and mileage to medical and mental health providers.

I have complied with my civil duty to mitigate, or lessen my losses by making reasonable efforts to seek medical and mental treatment. It is not my fault that after February 19, 2018 my medical insurance coverage through SHF terminated and that was very   time consuming to secure manageable medical insurance again through my husband's employer

Such discriminatory practices constitute a continuing violation of *among others* M.G.L. Chapter 151B Sections 1(18) 4 Paragraph 1, 1B-1C, 3(A), 4, 4A, 5, 9, 16 and Title VII of the 1964 Civil Rights Act.

I state the particulars of my amended charge, in more detail, in the attached statement.

----------------------------------------------------------------------------------------------------

I hereby verify, under the pains and penalties of perjury, that I have read this Amended Charge of Discrimination and find that the allegations contained herein and in the attached supportive statement are true to the best of my knowledge.

_____        _____, 2018

MARTHA RIVERA                                              DATE

**ATTACHMENT  3**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1.   Title of case (name of first party on each side only)   Martha C. Rivera V. Seven Hills Foundation, Inc.

2.   Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.   (See local rule 40.1(a)(1)).

☐   I.   160, 400, 410, 441, 535, 830*, 835*, 850, 880, 891, 893, R.23, REGARDLESS OF NATURE OF SUIT.

☑   II.   110, 130, 190, 196, 370, 375, 376, 440, 442, 443, 445, 446, 448, 470, 751, 820*, 840*, 895, 896, 899.

☐   III.   120, 140, 150, 151, 152, 153, 195, 210, 220, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 367, 368, 371, 380, 385, 422, 423, 430, 450, 460, 462, 463, 465, 480, 485, 490, 510, 530, 540, 550, 555, 560, 625, 690, 710, 720, 740, 790, 791, 861-865, 870, 871, 890, 950.
*Also complete AO 120 or AO 121. for patent, trademark or copyright cases.

3.   Title and number, if any, of related cases. (See local rule 40.1(g)).   If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

4.   Has a prior action between the same parties and based on the same claim ever been filed in this court?

    YES ☐   NO ☑

5.   Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC §2403)

    YES ☐   NO ☑

    If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

    YES ☐   NO ☑

6.   Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

    YES ☐   NO ☑

7.   Do all of the parties in this action, excluding governmental agencies of the United States and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

    YES ☑   NO ☐

    A.   If yes, in which division do all of the non-governmental parties reside?

    Eastern Division ☐   Central Division ☑   Western Division ☐

    B.   If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

    Eastern Division ☐   Central Division ☐   Western Division ☐

8.   If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)

    YES ☐   NO ☑

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME   MARTHA C. RIVERA, PRO SE
ADDRESS   24 BELAIR HEIGHTS, LEOMINSTER, MA 01453
TELEPHONE NO.   5086676947

(CategoryForm11-2020.wpd )

AO 240  (Rev. 10/03)

# UNITED STATES DISTRICT COURT

**ATTACHMENT 5**

**District of** Massachusetts

MARTHA C. RIVERA, PRO SE

**Plaintiff**

V.

SEVEN HILLS FOUNDATION, INC.

**Defendant**

**APPLICATION TO PROCEED
WITHOUT PREPAYMENT OF
FEES AND AFFIDAVIT**

CASE NUMBER:

I, _____ Martha C. Rivera _____ declare that I am the (check appropriate box)

☑ petitioner/plaintiff/movant          ☐ other _____

in the above-entitled proceeding; that in support of my request to proceed without prepayment of fees or costs under 28 USC §1915 I declare that I am unable to pay the costs of these proceedings and that I am entitled to the relief sought in the complaint/petition/motion.

In support of this application, I answer the following questions under penalty of perjury:

1.  Are you currently incarcerated?          ☐ Yes          ☑ No          (If "No," go to Part 2)

    If "Yes," state the place of your incarceration _____

    Are you employed at the institution? _____ Do you receive any payment from the institution? _____

    Attach a ledger sheet from the institution(s) of your incarceration showing at least the past **six months'** transactions.

2.  Are you currently employed?          ☐ Yes          ☑ No

    a.  If the answer is "Yes," state the amount of your take-home salary or wages and pay period and give the name and address of your employer.

    b.  If the answer is "No," state the date of your last employment, the amount of your take-home salary or wages and pay period and the name and address of your last employer.

        Seven Hills Foundation, last worked September 2017, earned $1,692.80.
        81 Hope Avenue, Worcester, MA

3.  In the past 12 twelve months have you received any money from any of the following sources?

    | | | |
    |---|---|---|
    | a. Business, profession or other self-employment | ☐ Yes | ☑ No |
    | b. Rent payments, interest or dividends | ☐ Yes | ☑ No |
    | c. Pensions, annuities or life insurance payments | ☐ Yes | ☑ No |
    | d. Disability or workers compensation payments | ☐ Yes | ☑ No |
    | e. Gifts or inheritances | ☐ Yes | ☑ No |
    | f. Any other sources | ☑ Yes | ☐ No |

    If the answer to any of the above is "Yes," describe, on the following page, each source of money and state the amount received and what you expect you will continue to receive.

AO 240 Reverse (Rev. 10/03)

Unemployment Insurance weekly benefits payment of $162. In 2020, these payments have accumulated to $5,508 and have served as economic relief for pandemic financial insecurity.

4.  Do you have **any** cash or checking or savings accounts?          ☑ Yes          ☐ No

If "Yes," state the total amount.  $667.88 _____

5.  Do you own any real estate, stocks, bonds, securities, other financial instruments, automobiles or any other thing of value?          ☑ Yes          ☐ No

If "Yes," describe the property and state its value.

I have a joint mortgage with my husband for our home, which is valued at $260,000.

6.  List the persons who are dependent on you for support, state your relationship to each person and indicate how much you contribute to their support.

I currently have no dependents.

I declare under penalty of perjury that the above information is true and correct.

| 1/15/2021 | Martha Rivera, PRO SE |
|---|---|
| Date | Signature of Applicant |

**NOTICE TO PRISONER:** A Prisoner seeking to proceed without prepayment of fees shall submit an affidavit stating all assets. In addition, a prisoner must attach a statement certified by the appropriate institutional officer showing all receipts, expenditures, and balances during the last six months in your institutional accounts. If you have multiple accounts, perhaps because you have been in multiple institutions, attach one certified statement of each account.